Q: Mr. Antolini, what do you do for a living?
A: Retired, disabled
Q: And how long have you been retired, Mr. Antolini?
A: More than 20 years. I just celebrated my 10th anniversary for disability from social security.
Q: And your Social Security benefits, are those your primary source of income?
A: Yes.
Q: Besides your Social Security benefits, do you have any other sources of income?
A: Yeah, my other pension.
Q. Mr. Antolini, besides your Social Security benefits and your pension disability from the state, do you have any other sources of income?
A. No.
Q: Mr. Antolini, I just want to be clear. Besides your Social Security benefits and your pension disability fund from the state, do you have any other sources of income?

A. No.
Q. Okay. And how long have you been receiving Social Security benefits?
A: Ten years.
Q: And how long have you been receiving your other pension disability from the state?
A. Seven.
Q. Mr. Antolini, has that – the amount that you received in Social Security benefits or pension disability benefits, has that amount changed year over year?
A. It goes up for - -
Q. Mr. Antolini, has that -- the amount that you received in Social Security benefits or pension disability benefits, has that amount changed year over year?
A. Cost of living increase.
Q. I understand if your cost of living has increased, but did your benefits increase as well?
Q Let me try and rephrase it. How much money did you receive in 2017 in --
A. I don't know.
Q. Can you estimate? (Indiscernible) I got Social Security and my state disability.
Q. Mr. Antolini, approximately how much do you receive each month in Social Security and in -- disability?
A. Right now it's approximately $4,000.
Q. And has it always been $4,000 month?
A. No. I told you it goes up by cost of living. (Indiscernible).
Q. Mr. Antolini, would you say that you received about $4,000 a month in total benefits --
Q. -- in 2017?
A. No.
Q. Was it more or less?
A. Less.
Q. Approximately how much did you receive each month in 2017?
A. I don't remember.
Q. Was it $3,000 a month?
A. Probably more.
Q. Okay. Between $3,000 and $4,000 a month?
A. Yeah.
Q. What about in 2018?

A. I don't know.
A. You're asking me the same question. It goes up with cost of living.
Q. Mr. Antolini, I understand if you don't know the exact figure. Do your best to estimate though, okay?
A. I don't know.
Q. In 2018, was it also about $3,000 or $4,000 a month?
A. It was between that, yeah.
Q. Okay. Would you say it's been the same in 2019?
A. It goes up incrementally, cost of living.
Q. Okay. Would you say that it was between $3,000 and $4,000 a month in 2019?
A. Yeah.
Q. Would you say it's also between $3,000 and $4,000 a month in 2020?
A. Correct.

Q. Okay. Mr. Antolini, is it fair to say that in 2017 through 2020, your total income from these benefits were between $36,000 – and $48,000.00?
A. I don't know the exact figure.
Q. Would you say it's about that amount, $36,000 to $48,000?
A. I'm not sure.
Q. Okay. You can use your estimation, Mr. Antolini.
A. If I had a calculator.
Q. Mr. Antolini, the two numbers that I just stated, $36,000 and $48,000, I calculated that by multiplying 3,000 times 12 and 4,000 times 12.
Q. So I just wanted to say, would that be a fair approximation of your gross annual income based on your total benefits received, $36,000 a year to $48,000 a year?
Q. Right now, okay. And how many people do you have in your current household, Mr. Antolini?
A. Two.
Q. Who are those individuals?
A. Myself and my mother.
Q. Okay. And does your mother currently work?
A. No.
Q. And Mr. Antolini, are you currently married?
Q. And does your wife live with you as well?
A. No.
Q. And where does your wife live?
A. In Manhattan.
Q. Mr. Antolini, do you receive any other sources of income besides the --you know, from any other individual?
A. I don't know what you mean. Not income.

<u>CELL PHONE AND EMAIL SHIT</u>
Q. Mr. Antolini, do you have a cell phone?
A. Yes.
Q. Mr. Antolini, how long have you had the same cell phone number for?
A. Maybe one year.
Q. You have several cell phones?
A. Yes.
Q. Do you currently have several cell phones or have you --
A. Just one.

Q. What is your cell phone number, Mr. Antolini?
A. 917 xxx-xxxx (redacted by affiant)
Q. I'm going to repeat that. (redacted by affiant) That was 917 xxx-xxxx
A. Correct.
MR. FINKELSTEIN: I'm going to object to that. I'm going to object to that. I'm going to ask that it be stricken from the record. That goes to attorney/client privileged phone calls to me and my phone calls to him. Objection. And that we'll mark for a ruling, Susan, so I can take that – I can write to the judge on that.
MR. MIZRAHI: Susan, Susan please note plaintiff's counsel's
improper speaking objection for the record.
MR. FINKELSTEIN: She's getting it all down, hopefully.
Q. Mr. Antolini, have you had the same cell phone number?

MR. FINKELSTEIN: Objection.
A. I got that recently; one year.
Q. Okay. And what was your cell phone number previously?
**Q. Mr. Antolini, why did you change your cell phone number?**
A. Cost.
THE WITNESS: Cost and reliability. Better deal.
Q. Do you know who your old carrier was?
A. No.
Q. Mr. Antolini, can you try and recall who your old carrier was?
Q. Mr. Antolini, before you changed cell phone carriers to Spectrum, how long did you have that carrier for?
A. I don't remember.
Q. Mr. Antolini, did you have any other carrier besides Great Call and Spectrum?
A. Maybe Consumer Cellular.
Q. Mr. Antolini, do you recall what **cell phone carrier you had in 2019?**
A. No.
Q. Mr. Antolini, a moment ago that you said that you had an email address that you've been using for a very long time?

A. No. I change it all the time. I change it frequently. Right now, xxxxxx@gmail.com. (redacted by affiant).
MR. FINKELSTEIN: Same objection, based on privilege.
Q. Mr. Antolini, besides the cell phone number ending in 1803, do you recall your old cell phone number?
Q. Do you know if that information would be written down anywhere?
MR. FINKELSTEIN: Objection.
A. I don't know.
Q. Do you know if you would have had it on a record, like a bill or a statement?
Q. Mr. Antolini, besides the email address that you've just given me, xxxxxx@gmail.com, did you have any other email addresses that you recall?
A. I don't remember the name.
Q. Can you just take a minute to try and recall them?
MR. FINKELSTEIN: Objection.

A. Could be anything. I don't know.
Q. Mr. Antolini, did you own a cell phone in 2019?

MR. FINKELSTEIN: Objection.
A. Could be anything. I don't know.
Q. Mr. Antolini, did you own a cell phone in 2019?
MR. FINKELSTEIN: Objection.
A. Yeah.
Q. Would you say that you used your cell phone every day?
A. No.
MR. FINKELSTEIN: Objection. Irrelevant, immaterial, harassing and annoying. Objection. Privileged.
Q. You had said that you had a cell phone in 2019, right?
Q. Mr. Antolini?
A. I'm here.
Q. Is it your testimony that you had a cell phone in *2019*?
MR. FINKELSTEIN: Objection. Dino, did you hear his question?
THE WITNESS: I heard.
A. I had, yeah.
Q. Do you always carry your cell phone with you whenever you go in and out of the house?
Non sequitur
Q. Mr. Antolini, do you have any dietary restrictions?


BOOZE
Q. Mr. Antolini, do you currently drink alcohol?
MR. FINKELSTEIN: Objection. You can answer. Go ahead.
A. Yeah. I have a glass of wine or two a day.
Q. You have a glass of wine or two a day?
MR. FINKELSTEIN: Objection Asked and answered.
Q. And besides a glass of wine or two a day, do you have any other alcohol --
A. No.
 Q. -- a day?
A. No.
MR. FINKELSTEIN: Objection.
Q. How many drinks on average do you have per week, Mr. Antolini?
MR. FINKELSTEIN: Objection.
A. I don't know.
Q. Do you drink any other alcohol besides wine?
MR. FINKELSTEIN: Asked and answered. Objection.
Q. What about right now; do you have any other alcohol right now besides wine?
A. No.
Q. Mr. Antolini, when was the last time that you dined out either for a meal or to have a cocktail?
A. Yesterday.

Q. Where did you go?
MR. FINKELSTEIN: Objection.
THE WITNESS: Yeah. Manhattan.
Q. Where in Manhattan was that, Mr. Antolini?

A. I just said that. The village; V-I-L-L-A-G-E.
Q. Where in Manhattan is that?
THE WITNESS: Greenwich Village.
Q. In Greenwich village?
A. Yes.
Q. Mr. Antolini, how often do you dine out in 2018?
A. You're asking me about three 3 years ago? That's ridiculous. I have no idea.
I know it's hard to think of an exact figure, but just use -- use your – use your best judgment?
Q. I'm sorry, what was that, Mr. Antolini?
A. One hundred to a thousand. That's my best estimate.
Q. Mr. Antolini, I didn't hear that?
A. One hundred to a thousand.
Q. One hundred to a thousand restaurants?
A. Yeah.
Q. Here, why don't we start now. Mr. Antolini, how many times have you dined *out in 2021?*
A. Not much.
Q. Because of the pandemic?
A. Yes.
Q. And what about before the pandemic, how often did you dine out?
A. Every week, once a week.
Q. Where did you normally go?
A. Anywhere.
Q. What were your favorite restaurants to go to?
Q. Were they the same ones that you had previously stated?
A. No. It could be anywhere in Manhattan or Queens. In Queens, I would go to Kind or I would go to Austin Street.
Q. Austin Street in Queens?
A. Yeah. Austin Street.
Q. You said Austin Street?
A. Yes.
Q. Mr. Antolini, when you normally go out to eat, do you go by yourself or do you go with other people?
A. My wife.
Q. Do you normally go out to eat with your wife?
A. Most of the times.
Q. Does she travel with you whenever you go out to eat?
Q. Mr. Antolini, how much would you normally pay for a meal or for a night out?
A. What year?
Mr. Antolini, I didn't hear that.

Q. You know, what about right now; how much do you currently pay for a meal or for a night out when you go out?
A. It could be 50 to 100.
Q. Okay. And what about last year; how much would you normally pay –for a night out?
Q. Either for a meal or for a night out?
Q. Was that number the same in 2019?

A. I don't know. It would be around there. That's my range. That's my range.
Q. What was that?
A. That's my range.
Q. That's your range? Is that what you said?
A. Yeah.
Q. And that would have been your same range $50 to $100 in 2018?
THE WITNESS: The same, more or less.
Q. Mr. Antolini, do you ever go out for cocktails? PAGE 98 L 6
Q. You said you normally go out to drink only for wine or a wine spritzer?
Q. Do you have any favorite places that you like to go to drink?
Q. Is that because of the pandemic?
Q. You said not anymore?
Q. What do you mean by that?
Q. When did you stop going out for drinks?
Q. How long ago?
Q. Was that, you know, before your-- you know, more than ten years ago?
Q. You said that you stopped going out for cocktails over ten years ago?
Q. And you said drinks or cocktails, right?
Q. I had asked, you know, do you normally go out for cocktails or drinks. You don't really go out for drinks or cocktails? Is that what you said?
Q. When was the last time that you went out for cocktails or drinks?
Q. And you said it was more than ten years ago? Is that what you said?
Q. Okay. Why does that number stand out? Why more than ten years?
Q. And after you became disabled, you stopped going out for drinks and for cocktails?
Q. So you don't -- so after your disability, you stopped going out for cocktails and drinks?
Q. Sir, Mr. Antolini, I just want to be clear. When -- was the last time that you went out for cocktails or drinks?
Q. And when was the last time that you went out for a glass of wine?
Q. Where do you normally go out to drink?
Q. Where did you used to go out to drink?
Q. When you used to go, before you stopped, did you have any favorite places to go out to drink?
Q. Mr. Antolini, besides Blarney Stone, did you go anywhere else to drink -- when you used to go out?
Q. Did you have any other favorite place to go out to drink?
Q. I don't know what that means. What does everywhere mean?
Q. Mr. Antolini, before the pandemic, where were some of your favorite places to go out to drink?
Q. When you normally, you know, used to go out for drinks, did you go out by yourself, or did you go out with someone else?

Q. Did you typically go with someone else, or did you typically go by yourself?
Q. Mr. Antolini how many times have you gone out for drinks in <u>2020?</u>
Q. So, Mr. Antolini, if I can just ask you again so we have a clear record, is it your testimony -- is it your testimony here today that you don't go out for drinks?
Q. And is it your testimony here today that you stopped going out for drinks about ten years ago, when you were diagnosed with your disability?
Q. And before the pandemic, you know, how often did you go out for wine or -- like, wine or spritzers?
Q. How frequently?
Q. What about for not hard liquor?
Q. Okay. Before the pandemic, when you used to go out for -- for wine or for spritzers -Q. Where did you normally go?
Q. Where in Manhattan did you normally go?
Q. And what were some of the places that you used to go out for drinks in Washington Square?
Q. Do you recall how often you went out for drinks in 2020?
Q. What about in 2019?
Q. Okay. And what about in 2018 how often did you used to go out for drinks in 2018?
Q. When you typically went out for drinks -- Mr. Antolini, did, you go with anyone else?
Q. Okay. Did you mostly go with someone else, or did you normally go by
yourself?
Q. And on average, how much do you spend on a round of drinks –when you go out?
Q. What does it depend on?
Q. Do you know what -- And, Mr. Antolini, you know, what is your price point? How much do you normally spend on a night out?
Q. And, Mr. Antolini, do you have any future plans to dine out? (they only provide alcohol)??
Q. Can you tell me about them?
Q. Okay. And what about any future plans to go out for drinks?
Q. So is it your testimony here today that you have no specific plans to go out for drinks and you have no specific plans to go out for a meal?
Q. Can you tell me more?
Q. You know, let's assume -- let's assume you're in good health.

Q. Can you tell me more about your future plans to go out to dine out?
Q.  Can you tell me more about those plans?
Q. Mr. Antolini, you said spur of the moment?  Okay. And what about future
plans to go out to drink?
Q. When you say same thing, you also mean –
Q. So spur of the moment?
Q. So do you have any specific plans to get any cocktails in the future?
MR. FINKELSTEIN: Objection. Asked and answered about six times.
A. I don't drink cocktails.
Q. I'm sorry. What I meant by hat was, do you have any specific plans to get drinks in the future?
Q. Mr. Antolini, can you tell me the last time you traveled to Manhattan?
A. I was there yesterday.
Q. Where did you go?
Q. Mr. Antolini, I just want to make sure we have a clear record – -- okay? So if I'm asking the

Same question, I just want to make sure we have the same record. Do you understand?
Q. By Washington Square?
Q. Were you there by yourself, or were you there with someone else?
Q. Who were you there with?
Q. Okay. Mr. Antolini, when was the last time you traveled to West Houston Street?
A. Yesterday.
Q. Can you tell me more about it? Mr. Antolini, I wasn't asking about the village. I was asking about West -- West Houston Street.
Q. Okay. Can you tell me more?
THE WITNESS: Madame X.
Q. You said everything is open? Is that what you said?
Q. What places are you referring to?
Q. Mr. Antolini, I want to make sure we're talking about the same thing.
Q. I'm asking you about West Houston Street. Are you familiar with West Houston?
Q. Okay. Can you name any business on West Houston Street?
Q. Can you name any of them?
Q. You can't name a single one?
Q. Can you name any other businesses, Mr. Antolini?
Q. Mr. Antolini, sitting here today, can you name any other businesses on West Houston Street?
Q. Do you have any favorite places on West Houston Street?
Q. I'm specifically referring to West Houston Street?
Q. Mr. Antolini, how many times have you traveled to West Houston Street in 2018?
Q. Okay. What about 2019; do you remember?
Q. In 2019, where do you – where did you typically go on West Houston Street?
Q. You said you don't keep a diary?
Q. In 2019, when you were frequenting West Houston Street, who were you there with?
Q. How many times did you frequent West Houston Street in 2020?
Q. And Mr. Antolini, how many times did you go to West Houston Street in 2021?

Q. Do you have any future plans to visit West Houston Street?
A. Yeah. Like I said weather permitting, health permitting.
Q. Health permitting, do you have any future plans to go to West Houston Street?
Q. I want to make sure we have a –
Q. Can you tell me about those plans?
Q. -- before you said that you don't really drink cocktails when you go out. Is that accurate?

Cases

Q. Have you ever served as a plaintiff in a lawsuit before?
Q. How many cases have you served as a plaintiff in?
Q. Can you tell me about these cases?
Q. Mr. Antolini, just based on what you know, can you tell me about these cases?
Q. You don't know what these cases are?
In your own words, can you tell me what these cases are about?
MR. FINKELSTEIN: Same objection. Harassment now. That's the sixth time, I believe, you've asked it now.
Q. Mr. Antolini, are you aware that you're named as a plaintiff in 16 other lawsuits -- filed in the

Q. I'm asking -- I'm asking if you're aware that you're named as a plaintiff in 16 other lawsuits in the Southern District of New York?
Q. Mr. Antolini, are you familiar with the business at 8288 Fulton Street?
Q. Do you know where Fulton Street is?
Q. Okay. Do you know the business at 8288 Fulton Street?
Q. Have you ever visited the business at 8288 Fulton Street?
Q. I'm not asking you if you keep a diary. I'm asking, sitting – here today, have you ever been to the business at 8288 Fulton Street?
A. I never went in.
Q. When you say you've never went in, what are you referring to?
Q. Where? Where are you referring to? Where?
A. You said Fulton Street.
Q. What is at that address Mr. Antolini?
A. I don't know. Like I said, I don't keep a diary.
Q. So if you don't keep a diary, you know, I'm asking, sitting here today, do you know what that business is at 8288 Fulton Street?
Q. When did you visit the business at 8288 Fulton Street?
Q. Mr. Antolini, are you familiar with a business by the name of Wall Street Bath & Spa?
Q. Mr. Antolini, are you familiar with a business by the name of Athena Nail Spa?
Q. Antolini, are you familiar with a business by the name of Benny's Thai Café?
Q. What about Isaac Fulton Haircutter?
Q. And Asia Walk?
Q What about Mr. Rafael's Cleaners & Tailoring?
Q. What about My Opticians?
Q. What about NY City Buyers?
Q. What about Tandoor Palace?
Q. So, for the record, you're not familiar with any of those businesses?
A. No. I never went in there.
Q. I'm not asking if you've ever been in there; I'm asking if you're familiar with any businesses by those names?
A. No.
12 Q. I'm sorry, Mr. Antolini, can you repeat that?
A. No.
Q. Is it your testimony that you've never visited any of those businesses?
A. I never went in.
Q. Mr. Antolini, can you repeat that? WHEN HE DIDN'T LIKE THE ANSWERS HE ALWAYS TOLD MY CLIENT TO REPEAT WHAT HE HAD JUST SAID –THE RECORD IS REPLETE WITH THAT HARASSMENT.
A. I never went in.
Q. Mr. Antolini, I'm not asking if you've ever went in; I'm asking if you've ever visited them?
A. Visiting and going in, he's using semantics (indiscernible).
THE WITNESS: I think they're underground. They're all street level.
THE WITNESS: I think the lawyer is using semantics to confuse me.
Q. Mr. Antolini, are you familiar with the business at 110 Thompson Street, New York, New York 10012?
Q. Okay. Mr. Antolini, let me be clear with you -- that the judge has given me five days to take

your deposition.
Q No. He gave me Monday, Tuesday Wednesday, Thursday, Friday. I have – I have all the SEVEN time to sit and take your deposition.

MR. FINKELSTEIN: Objection. Sounds like harassment.
MR. MIZRAHI: No.
Q. Mr. Antolini, listen to me.

Q. Okay. I'm just asking you to answer my questions. The sooner you answer my questions, the sooner we can be done.
Q. Mr. Antolini, are you familiar with a restaurant by the name of Coquette?
Q. Mr. Antolini, my question was if you're familiar with a restaurant by the name of Coquette?
Q. Mr. Antolini, I'm not asking whether or not you keep a diary.
A. I have no idea where you're going. What are you trying to do? What does it have to do with Madame X?
Q. Mr. Antolini, I'm going to ask the questions and you're going to answer them. THREATS
Q. I ask the questions and you have to answer them.
Q. What about the restaurant located at 545 East 5th Street -- New York, New York 10009?
Q. It also has another address; it's 76 Avenue B, New York, New York,10009?
Q. And are you familiar with a business at 76 Avenue B?
Q. I asked if you've ever been to the business at 76 Avenue B?
A. Never been in. Never been in.
Q. Have you ever -- have you ever visited it?
Q. Mr. Antolini, I'm not asking you if you've ever been in. I'm asking if you ever visited it?
Q. Okay. What is that business? Have you ever attempted to visit that –business?
Q. A moment ago you said that you attempted to visit it?
Q. So I'm going to ask you again, what is that business?
Q. So if you don't know, how can you tell me that you visited it? FIGHTING WITH DINO
A. I was never in there.
Q. Mr. Antolini, I'm not asking you if you've ever --
Q. Mr. Antolini?
Q. Mr. Antolini, I asked if you've ever attempted to visit the business? And what did you --
Q. Okay. What is that -- what is that business address? What is that?
Q. If you don't -- if you don't remember, how can you remember that you ever attempted to visit it?
Q. Okay. When did you visit this business?
Q. Mr. Antolini, do you recall how many times you visited the business?
Q. Do you know what's located at that business address?
Q. And do you have any plans to go back to that address, Mr. Antolini?
Q. Mr. Antolini, are you familiar with the address at 222 Thompson Street, New York, New York?
MR. FINKELSTEIN: Same objection, pursuant to Rule 30(a) on grounds. Same objection.
Q. Have you ever visited that business address?
Q. Have you ever attempted to visit that business address?
Q. When did you attempt to visit this business?

Q. What date did you attempt – to visit this business?
Q. Why did you attempt to visit -- this business?
Q. Do you have any future plans to visit this business?
Q. I'm talking about the business at 222 Thompson Street, New York, New York?
Q. Do you know what that business address is?
Q. So you don't have any specific –
THE WITNESS: But now I will. And if I have a stroke, I blame him.
Q. Mr. Antolini?
Q. I'm asking you a question, Mr. Antolini.

Q. Mr. Antolini, are you familiar with a business at 195 10th Avenue?
Q. Mr. Antolini, what is this business address?
Q. Okay. Mr. Antolini, I'm not asking if you keep a diary.
Q. Mr. Antolini, I'm not interested in knowing if you keep a diary. I'm interested in knowing if you know the business address at 195 10th Avenue?
Q. Do you know what is located at hat business?
Q. Are you familiar with a restaurant by the name of Pepe Giallo?
Q. What is it?
Q. Have you ever attempted to visit this business? What kind of restaurant is it?
Q. What date did you attempt to visit this business. When?
Q. What time did you attempt -- to visit this business?
Q. Who were you with when you attempted to visit this business?
Q. How many times -- how many times have you attempted to visit this business?
Q. Mr. Antolini, are you familiar with the business at 228 Thompson Street in -- New York, New York 10012?
Q. Mr. Antolini?
Q. I haven't asked you this question before, Mr. Antolini -- and I'm going to ask it - I'm going to just ask it again. Have you -- ever -- are you familiar with the business at 228 Thompson Street – in New York, New York?
Q. Have you ever visited this business?
Q. Have you ever attempted to visit this business?
Q. When?
A. I don't remember.

## Q. How can you be sure that you've attempted to visit it if you can't remember what *time* you visited?

Q. Mr. Antolini, I'm just asking you a question. When did you attempt to visit this business?
Q. Mr. Antolini, when did you attempt to visit this business?
Q. Mr. Antolini, are you familiar with a business at 160 -- - Eighth Avenue, New York, New York 10011?
Q. Mr. Antolini, do you know what this address is?
A. No.
Q. Have you ever attempted to visit this address?
Q. And do you have any future plans to visit this address?
Q. Okay. Mr. Antolini -- are you familiar with the address at 39 Christopher Street –New York, New York.

Q. Mr. Antolini, I'm not asking you if you keep a diary. I'm asking you, yes or no -- are you familiar with the business at --
MR. FINKELSTEIN: Objection. Objection to the tone of counsel's voice. Objection.
Q. Mr. Antolini, what is – what is the business at 39 Christopher Street, New York, New York 10014?
Q. Have you ever visited this business?

Q. Do you have any future plans to return to this business?
Q. Are you familiar with Lamano West Village restaurant?
Q. Are you familiar with the business at 79 Orchard Street New York, NY 10002?
Q. Do you know what the business is at 79 Orchard Street?

Q. It goes by the name -- it's a restaurant by the name of Cafe Katja?
Q. What is it?
Q. Mr. Antolini, have you ever visited or attempted to visit this business?
Q. When?
Q. Mr. Antolini, I see that you're looking at another screen right now.
Q. Are you -- are you looking at another screen right now?
Q. Okay. I see -- I see that you have another screen in front of you. Are you looking somewhere else?
Q. Mr. Antolini, have you ever visited or attempted to visit the business at 79 Orchard Street?
Q. When?
Q. How many times did you attempt to visit this business?
Q. Why did you attempt to visit this business?
Q. Do you have any future plans to return to that business?

Q. Can you tell me what they are?
Q. Mr. Antolini, are you familiar with a business at 207 10th Avenue, New York, New York 10011?
Q. Mr. Antolini, yes or no --
Q. Are you familiar with a business at 207 10th Avenue?
Q. Do you know -- do you know what the business at 207 10th Avenue is?
Q. Are you familiar with a restaurant by the name of Juban?
Q. What is it?
Q. Tell me what it is? What is it?
Q. What kind of restaurant is it?
Q. Are you familiar with a restaurant by the name of Juban?
Q. What is it?
Q. When did you attempt to visit-- this business?
Q. Mr. Antolini, how many times have you attempted to visit this business?
Q. Why did you attempt to visit this business?
Q. And do you have any future plans to return to this business?
Q. Is it currently inaccessible?
Q. Are you familiar with a restaurant by the name of Empellon?

Q. What is it?
Q. Where is this restaurant located, Mr. Antolini?
Q. Have you ever attempted to visit this business?
Q. How many times have you attempted to visit that business?
Q. And why did you attempt to visit that business?
Q. Do you have any future plans to return there?
Q. Are you familiar with the business at 145 Avenue C –New York, New York?
Q. Are you familiar with the restaurant by the name of Esperanto?
Q. Okay. Have you ever visited a restaurant by the name of Esperanto?
Q. Have you ever attempted to visit a restaurant by the name of Esperanto?
Q. When?
Q. How many times have you attempted to visit that restaurant?
Q. Do you have any future plans to return to this business?
Q. Can you tell me more about your future plans to return to the restaurant?
Q. Mr. Antolini, are you familiar with the restaurant at 1 --
Q. Mr. Antolini, Mr. Antolini, are you familiar with the restaurant located at 154 West 13th Street in New York?
Q. I'm asking you if you're familiar with the business located at 154 West 13th Street in New York?
Q. Have you ever visited -- have you ever visited the business located at 154 West 13th Street?
Q. Are you familiar with a restaurant by the name of Flex Muscles?
Q. Have you ever attempted to visit the Flex Muscles restaurant at – West 13th Street?
Q. When?
Q. How many times –
Q. How many times have you attempted to visit that address?
Q. Do you have any future plans to return to that business?
Q. Are you familiar with a business at 163 East 33rd Street in New York?
Q. Mr. Antolini, yes or no, are you familiar with the business –at 163 East 33rd Street?
Q. Are you familiar with a restaurant by the name of Le Parisien Bistrot?
Q. Have you ever attempted to visit the business Le Parisien Bistrot?
Q. Do you have any future intentions to visit Le Parisien Bistrot?
Q. I'm going to ask again. Are you familiar with a business at 145 Avenue C, New York, New York?
Q. Have you ever visited the business located at 145 Avenue C, New York, New York?
Q. Dino, you said, I have –cerebral—cerebral ataxia?
MR. FINKELSTEIN: Objection. You keep interrupting him right in the middle of answering, and the record speaks for itself. Objection again.
MR. FINKELSTEIN: And note my continuing objection under Rule 30(a) for the record. Thank you.
Q.  Susan, I want to make sure that you got that testimony when the witness said cerebral ataxia.
Q. Mr. Antolini, have you ever attempted to visit the business at 145 Avenue C?
Q. Mr. Antolini, what about the business at 303 Bowery, New York, New York 10003?
Q. Have you ever attempted –
Q. Have you ever attempted to visit this business?
Q. Have you ever attempted to visit the business at 303 Bowery in New York, New York?
Q. Do you have any future plans to return to this business --

Q. -- Mr. Antolini?

Q. The name of the business is Trek Bicycle Bowery. What was that, Mr. Antolini?

Q. What was the purpose of your visit?

Q. Can you tell me more?

Q. Mr. Antolini, are you familiar-- Mr. Antolini?

Q. Are you familiar with the business at 60 East 42nd Street, Suite 4700 in New York, New 4700?

Q. I'm not asking if you're MapQuest; I'm asking if you're familiar with the business at 60 East 42nd Street?

Q. I'm not asking -- I'm not asking if you keep a diary. I'm asking --if you're familiar with the business at 60 East 42nd Street—

Q. Have you ever attempted to visit the business at 60 East 42nd Street, Suite 4700?

Q. How many times have you attempted to visit this business?

Q. Do you have any future plans to visit this business?

Q. Do you know what's located -- do you know what's located at that business?

Q. Mr. Antolini, do you have any memory loss issues?

Q. Can you tell me about them?

Q. Mr. Antolini, can you tell me about your memory issues?

A. I told you, look up my medical records. You have copies.

Q. No, no. Mr. Antolini, I'm asking you --I'm asking you, sitting here today, please, can you tell me about your medical -- your memory loss issues?

Q. Tell me? Tell me about your medical history and your memory loss issues?

Q. What kind of memory loss issues do you have?

Q. Mr. Antolini, you said dates and names and places?

Q. Mr. Antolini?

A. Yeah.

Q. You said dates, names, places.

MR. FINKELSTEIN: Objection.

Q. What do you mean by that?

Q. Mr. Antolini, I understand that you fractured your left hip?

Q. Mr. Antolini, I understand that you fractured your left hip.

Q. Can you repeat that?

Q. You said you had a hip replacement?

Q. *Why* did you get a hip replacement?

Q. Okay. You fractured your hip?

Q. How did you fracture your hip, Mr. Antolini?

Q. Why did you get a hip replacement?

Q. Mr. Antolini? Mr. Antolini?

Q. Do you recall **why** you fractured your hip?

Q. How did you fracture your hip?

THE COURT REPORTER: Okay. So I went from my scooter to a park bench?

THE WITNESS: Yeah.

Q. Mr. Antolini, are you familiar with a condition by the name of alcoholic cerebral degeneration?

Q. What is it?

Q. Mr. Antolini, what is it?

Q. Okay. Can you describe what it is in laymen's terms?
Q. Is that killing of the brain cells caused by alcohol consumption?  SHAMING HIM
Q. Have you ever been diagnosed with alcoholic cerebral degeneration?
Q. Mr. Antolini, my question was –

Q. I need to ask you because you're sitting here. My question is: Have you ever been diagnosed with alcoholic cerebral degeneration?
Q. Mr. Antolini, do you have a history of alcoholism?
Q. Can you tell me about it?
A. No.
Q. Mr. Antolini, respectfully, you're being deposed right now. So unless your attorney instructs you not to answer the question –      WOW, I CAN'T ,unless or motion, PRIVILEGED REAL CUTE.
Q. Mr. Antolini, unless your attorney instructs you not to answer --
9 MR. FINKELSTEIN: Objection. Objection. My continuing objection.
Q. Unless your attorney tells you not to answer -- Q. -- you have an obligation to answer the question, Mr. Antolini.
Q. Mr. Antolini, do you have a history of alcoholism?
Q. Can you tell me about it?
Q. Have you ever been treated for alcohol substance abuse?
Q. Has your doctor ever directed you to abstain from alcohol?
Q. Do you know what abstain means?  *****************
Q. Mr. Antolini, who is Dr. Matthew Swan?
Q. Do you recall visiting Dr. Swan's office on July 18, 2017?
Q. Mr. Antolini, I'm showing you a  copy -- I'm showing you a copy of some of your medical records.
Q. Okay. Do you recognize this document?
Q. Okay. These are progress notes from your doctor, Dr. Matthew Swan.
Q. In your progress notes dated July 18, 2017 -- -- there are some notes that your doctor had made. I'm going to read some of them to you, okay?
Q. Here, it says, Memory is worsening. Has difficulty recalling information.
Q. Spontaneous recall is difficult. He is delayed in recalling information. He was told by Social Security M.D. that he has dementia.
Q. Can you tell me a little bit about the memory loss issues Dr. Swan is referring to?
MR. FINKELSTEIN: Okay. And, Susan, what was his answer, please?
MR. MIZRAHI: No. I'm not asking for the answer, and I'm going to --
MR. FINKELSTEIN: I am. I am. I'm asking for the answer.
MR. MIZRAHI: Madam Court Reporter, I'm ready to continue. You don't have to repeat it.
Q. Mr. Antolini --
MR. FINKELSTEIN: I want to hear his answer, Susan, please. And get this all on the record, that he's refusing me to hear the testimony that's already in the record. I'd like to hear his answer, please. Obstructing the DEPO!!
Q. Can you tell me about the difficulty in spontaneous recall that Dr. Swan was referring to?
Q. Mr. Antolini do you suffer from memory loss issues?
Q. Mr. Antolini, do you have difficulty recalling information?
Q. Okay. Do you have difficulty in spontaneous recall Mr. Antolini?

Q. It says here that you were told by Social Security that you have dementia?
Q. Can you tell me more?
Q. Have you ever been diagnosed with dementia?
A. That's why I have disability.
Q. Do you suffer from dementia?

Q. Mr. Antolini, it says -- it says here that, quote, He drinks a little sake with lunch and dinner mixed with water. Last admission for detox was about two years ago.
Q. Do you see that?
Q. Why do you dilute -- can you tell me about the diluted sake that Dr. Swan is referring to?
Q. Why do you dilute your sake with water?
A. Because I need water.
Q. So why don't you just drink water?
Q. You **received assistance for alcohol substance abuse issues**, Mr. Antolini; is that accurate?
Q. Have you ever -- can you tell me about the admission for detox—that Dr. Swan is referring to?
Q. Were you ever -- were you ever admitted for alcohol substance abuse issues?
Q. Can you tell me about it?

Q. Mr. Antolini, it says here that, quote, you are concerned about memory.
Q. Is that referring to your -- is that referring to your memory loss issues?
Q. Are you currently concerned about your memory loss issues?
Q. Do you currently suffer from memory loss issues?
Q. It says here that you were suffering from cognitive impairments –potentially—potentially related to longstanding alcohol abuse.
Q. Can you tell me about these cognitive impairments?
Q. Have you ever – have you ever suffered from cognitive impairments?
Q. Is there anything else that you remember about that visit on July 18, 2017?
A. What do you want to know?
Q. Is there anything else that you recall about your visit with Dr. Swan on July 18, 2017?
Q. Anything else that you remember about that visit?
Q. Mr. Antolini, do you recall visiting Dr. Swan's office on November 14, 2017?
Q. Mr. Antolini, do you see these -- do you see these progress notes dated November 14, 2017?
Q. I'm going to read -- I'm going to read more of the progress notes. Mr. Antolini, it says here that, quote, Memory was --
A. I blocked you out. I don't want to hear you right now.
Q. Mr. Antolini, it says here, quote, your memory is worsening. You're having trouble with concentration. You were to repeat a brain MRI, and you were referred to obtain labs for reversible dementia that you did not complete. SCOLDING HIM!!
Q. It also says –
Q. Were you suffering from memory loss issues on November 14, 2017?
Q. It also says here that, according to your wife, that you were forgetting many things.
Q. Is that accurate?
Q. It also says here, Mr. Antolini, that you have difficulty recalling information -- in that you suffer from intermittent staring spells –lasting as much as ten minutes.

Q. Do you -- do you still suffer from those intermittent staring spells?
Q. Mr. Antolini, why didn't you complete the labs for your dementia?
A. What are you talking about?
Q. It says here –
A. I have no idea what you're talking about.

Q. It says here that you are –
A. You know everything. Why are you asking?
Q. Mr. Antolini, please, please **calm down**. GOADING PRICK
Q. Mr. Antolini, it says here that you were instructed to -- referred to obtain labs for reversible dementia but you did not complete this workup. Why didn't you –
Q. Do you see where it says that right here, that you were referred to obtain labs for reversible dementia?
MR. FINKELSTEIN: Asked and answered three times. Objection. Harassment. Annoying. He said he has no idea what you're talking about, counselor, and I think we gotta get the judge on the phone. This is insane. If you're going to continue to harass, let me know; otherwise, I'm going to have to get him on the phone even though he said don't call. This is crazy.
Mr. Mizrahi: Madam Court Reporter, please note the continued improper speaking objections.
Q. Mr. Antolini, it says here that your doctor reordered labs for a reversible dementia?
Q. Do you recall -- do you recall –these labs?
Q. Can you tell me more about this dementia? \*\*\*\*\*\*\*\*\*\*\*
MR. FINKELSTEIN: That's the fifth time you asked that. Objection.
Q. In these progress notes, it says that at lunch and dinner, you drink a little sake with water; that your -- that your wife is working to help you cut it down and dilute the sake more. Do you see that?
Q. Okay. Why do you dilute your sake with water?
Q. Mr. Antolini, do you recall visiting Dr. Swan's office on February 15, 2018?
Q. I'm showing you progress notes from February 15, 2018. Do you see them?
Q. Do you remember anything about your visit on that day?
Q. Mr. Antolini, I'm showing you
progress notes from February 22, 2018?
Q. It says here, quote, you're having more trouble with words and names than with numbers.
Q. That you have -- that you have difficulty filling in the blank with words. Do you see that?
Q. It says here that Dr. Swan spent more than half of this 30-minute visit counseling you in the importance of alcohol abstinence. Do you see that?
Q. Do you recall that conversation?
Q. Did you follow Dr. Swan's advice when he was explaining the importance of alcohol
A. I don't remember him saying abstention?
Q. It's written right here.
Q. Do you remember hearing Dr. Swan speak when you go to visit him?
Q. And do you follow his advice when he gives you advice?
Q. So if Dr. Swan is advising you the importance of alcohol abstention, would you follow that advice?
Q. I'm showing you progress notes from March 14, 2019. Okay. Do you recall visiting Dr. Swan's office on March 14, 2019?
Q. Okay. It says here, quote, you're having trouble remembering names. It takes time to recall a name. It pops into his memory hours later. Do you see that?

Q. Yeah? Were you suffering from memory loss issues at that time?
Q. Were you suffering from memory recall issues at that time?
Q. And it also says here that you drink one or two drinks of sake diluted in water at that time?
Q. Is that because you were a recovering alcoholic?
Q. Were you a recovering alcohol abuser?
Q. And at the end of the notes, it also says that Dr. Swan spent more than half of this 30-minute visit in counseling on the importance of alcohol abstinence. Do you see that?
Q. Did you follow Dr. Swan's advice, Mr. Antolini?
Q. I'm showing you progress notes dated September 17, 2019, and it says here that you, quote, still have trouble remembering names, mostly for acquaintances, not for people he knows well.
Q. Were you still suffering --were you still suffering from memory recall issues at that time?
Q. And it also says here that, quote, Dr. Swan spent more than half of this 40-minute visit in counseling the importance of alcohol abstinence.
Q. Did you follow Dr. Swan's advice?
Q. It says here that he did; that he told you -- he counseled you on the –
Q. Mr. Antolini, you're still suffering from memory recall issues at this time?
Q. Were you still suffering from memory recall issues on September 17, 2019?
Q. Well, I'm just saying, you know, it says here that -- in the notes, that you're still having trouble remembering names, mostly for acquaintances, not for people he knows well.
A. Yes.
Q. So, for the record, were you still suffering from memory recall issues in September of '19?
Q. I just want to make sure that we're on the same page.
Q. Mr. Antolini, I'm showing you progress notes dated January 21, 2020.
Q. It says here, quote, you still have issues with names. Stable, not worse.

Q. So were you still having issues with memory loss -- with memory loss or with memory recall?
Q. It says here that you were drinking minimally. Is that referring to alcohol consumption?
Q. And it says that at dinner, you still drink diluted sake, sometimes at lunch, one or two -- -- total, not a full drink each time.
Q. And that was because you were recovering from alcohol consumption?
Q. Mr. Antolini, it says here that Dr. Swan spent more than half of this visit counseling the importance of alcohol abstinence.
Q. But did you follow this advice at the January 21, 2020 visit?