UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x
DINO ANTOLINI,

                              Plaintiff,                    Case No.: 1:19-cv-09038-GBD

         -against-
                                                           DECLARATION IN SUPPORT
                                                           OF MOTION TO RECUSE
AMY MCCLOSKEY, THERESA LAURENT, DIMUR
ENTERPRISES INC., EDDIE C K CHUNG and C&S
MILLENIUM REAL ESTATE LLC,

                              Defendants,
- - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF STUART H. FINKELSTEIN

This declaration is made pursuant to U.S.C. (§) 1746 and S.D.N.Y. Local Civil Rule 1.9(a) by

Stuart H. Finkelstein as follows:

**1.**         I, Stuart H. Finkelstein, Esq. (hereinafter 'Affiant'), am a member of the bar of this Court

and am the attorney of record for Plaintiff in the within action and have knowledge concerning the

subject matter of this Declaration.

**2.**         Affiant submits this Declaration in support of Plaintiff's Motion for an order seeking the

recusal of Magistrate Judge Stewart Aaron from further participation in this matter and appointing

a different Magistrate Judge of this Court. No prior application has been made for the relief sought

herein and affiant submits that the Movant's application is timely in light of the most recent orders

of Judge Aaron. Affiant further avers the papers on which it is based are made in good faith and

are certified pursuant to Section 130-1.1-a of the rules of the Chief Administrator (22 NYCRR).

**3.**         As shown herein and in the accompanying **exhibits that** are made part of this Motion,

Magistrate Judge Aaron has allowed and engendered the ongoing abuse, humiliation and

degradation of Plaintiff Dino Antolini. Judge Aaron's actions in his Orders throughout the docket

provide proof of same. Most specifically, Judge Aaron's orders of July, 2021 and continuing to

date.

The Judge has openly demonstrated extreme bias and prejudice to Mr. Antolini along with his predisposed, invasive, and out of bounds behavior towards Plaintiff's counsel (your affiant), blatantly displaying his bias and lack of impartiality. Judge Aaron must step down from this case in the interest of justice and fairness, and a different Judge be appointed.

4.        To begin with some of the most recent developments in the case, the very latest orders [Dkt. No'. s 191,192, and 193] address the continuation of Plaintiff's deposition, held on April 19, 2021. At that deposition, Mr. Antolini was abused, persecuted, ridiculed, shamed, and robbed of his dignity, all condoned by Judge Aaron. Even though Plaintiff made his Rule 30 Motion after terminating the deposition and to end its continuation (Dkt. No. 177) having given multiple notices during the course of the questioning to defendants' lawyer to cease and desist with his sordid questioning and objecting pursuant to attorney client privilege) it was denied, without any reason, explanation or any basis by Judge Aaron. The Judge had ordered that Mr. Antolin's deposition be continued on July 23, 2021 but Mr. Antolini was unable to attend due his wife's medical needs. In fact, Judge Aaron ordered Mr. Antolini and I to attend a telephonic conference on August 4, 2021 to determine, to the court's sufficiency, the truthfulness of Plaintiff's wife's medical conditions surrounding her visit, along with Mr. Antolini with her Doctor at Bellevue Hospital on July 23, 2021! (Dkt. No. 204). The Judge was actually holding a hearing to determine the validity of Plaintiff's wife's health leading to Mr. Antolini not being able to attend his second improper deposition. At the conference, the Judge engaged in perverse gaslighting, shouted at me multiple times, and also provided inappropriate and unsolicited advice *telling Plaintiff's counsel how to practice law.* The Judge ordered the continuation of the deposition despite Mr. Antolini having already appeared at his deposition on April 19, 2021. The Judge then also threatened, on two separate occasions, that he would recommend to Judge Daniels that Plaintiff's lawsuit be dismissed on the merits. All while, the judge has continually stayed **ANY** discovery from two of the defendants, i.e., the owners of the facility, although their answers were served some seven months ago, thus improperly preventing Plaintiff from prosecuting his case.

**5.**        By way background, Dino Antolini is a 64-year-old man who has multiple disabling diseases that necessitate his use of a wheelchair. Defendants have had his medical records for over a year documenting his cerebral ataxia, undergoing surgical intervention consisting of internal fixation of a 14-inch intramedullary rod along with seven Kuntscher nails of his left hip, incontinent to urine, and recurrent Bell's Palsy affecting his speech. He has difficulty eating, as food gets stuck between his lower lip or cheek and his teeth, and has difficulty articulating words. His left eye is also irritated due to difficulty blinking. Mr. Antolini faced a barrage of invasive questions about his and his wife's income (in this ADA discrimination lawsuit for a Public Accommodation not providing access to the disabled) and disgracefully was questioned about his 93-year-old mother's work status, et al. He was faced with a barrage of humiliating and degrading questions about his purported alcoholism, (*he was even asked if he still drinks alcohol),* <u>whether he suffers from dementia, and why he presently adds water to his sake</u>. The out of bounds questioning of Mr. Antolini included questions about his cell phone numbers, the accounts of his cell phone companies going back years before the filing of this suit, and if he currently takes it with him when he leaves his home. He was also questioned for his email addresses' that were made part of the record.

**6.**        Despite Plaintiff attesting in his sworn to Interrogatories that he authorized affiant to initiate the instant lawsuit, [Dkt. No. 63] some eleven (11) months ago, Judge Aaron, nevertheless ordered, on August 7, 2020, that Mr. Antolini can be asked about the very same subject at his deposition. However, in the interim, some seven months later on March 2, 2021, (Dkt. No.'s 148-150) some two months before Mr. Antolin's deposition, the Judge held a video conference with Plaintiff. The Judge swore in Mr. Antolini and then proceeded to question him.

"THE COURT: Okay. So let me ask you. Obviously from what I'm hearing, I hear that you're having some difficulty speaking. Why don't you explain to me what the situation is with respect to your speech, please. And for the court reporter's benefit, this will be Mr. Antolini speaking.
THE PLAINTIFF: Okay. Your Honor, I'm currently undergoing another bout of (inaudible) palsy.
THE COURT: So let me ask you, Mr. Antolini: Are you able to type?
THE PLAINTIFF: I'm not able to.
THE COURT: So, we seem to have lost your video for a second there. I don't know if something's covering your camera. Yeah. It looks like your hand may be covering the camera, or someone's hand.
THE PLAINTIFF: Okay. Okay.

THE COURT: Again -- okay, that's better. That's better. So, Mr. Antolini, I'm sorry. Are you able to type?

THE PLAINTIFF: Not really.

THE COURT: Okay. Are you able to write?

THE PLAINTIFF: No.

THE COURT: Okay.

THE PLAINTIFF: My handwriting is horrible because of my cerebellar ataxia. As you see, my face is distorted because of - -

THE COURT: Okay. So, Mr. Antolini, I'm going to share my screen with you.

THE PLAINTIFF: Yeah. Okay."

**To be clear, this appearance before the Judge was based upon Mr. Antolin's ability to speak at his deposition in April as he had recently sustained another attack of Bell's Palsy, now affecting both sides of his mouth. *

THE COURT: Hold on one second. So this is a document that was filed at ECF 144, and there's a signature there.

THE PLAINTIFF: Yeah.

THE COURT: You're able to make that image using your handwriting? You're able -- that's your handwriting?

THE PLAINTIFF: Yes.

THE COURT: How did you send this document to your - - to Mr. Finkelstein?

THE PLAINTIFF: Email.

THE COURT: You scanned it and emailed it?

THE PLAINTIFF: Email, yeah.[1]

THE COURT: Right, You have a scanner there with you?

THE PLAINTIFF: Not with me. In Queens. Right now I'm in Manhattan.

THE COURT: Okay. So when you're in Queens you have a scanner available to you?

THE PLAINTIFF: Correct.

THE COURT: Okay. Let me ask you. How many times have you personally appeared in a courthouse in the Southern District of New York?

THE PLAINTIFF: I went to a meeting in a room, not actual court.

THE COURT: So, Mr. Antolini, you're aware there's a courthouse at 500 Pearl Street, correct?[2]

THE PLAINTIFF: Correct.

THE COURT: And you're aware there's a courthouse at 40 Foley Square; am I correct?

THE PLAINTIFF: Correct.

THE COURT: All right. *How many times have you been in the building at 500 Pearl Street*?

The interrogation was humiliating. The Magistrate questioned Mr. Antolini about his appearance at the ***grand jury***,[3] asking about his other cases, his appearances, and what they were about. I was then questioned regarding my letter to the Judge listing the appearances that took place telephonically with Judges on those other cases, (as opposed to appearing in a courtroom) and if

[1] *See* Telephonic Hearing Transcript (in between Dkt No.'s 150 & 151) at 3-4 for inappropriate cross examination on Plaintiff's handwriting and how Plaintiff communicates with his attorney.
[2] Judge Aaron's humiliation of Plaintiff during the conference was repeated and continuous. *See Id.* at 6-7, 20-22.
[3] Curiously, Judge Aaron did not delve further into Plaintiff's response, instead enabling defendants' lawyer to do so. *See Id.* at 6. This presumably occurred because the judge knew his questioning was out of bounds and as such, it would absolve the judge of any impropriety to pass along the inappropriate questioning to defendants' counsel.

those appearances were on the record (to my knowledge they are). Then, the Magistrate directed, page 12, lines 8-9 of the March 2, 2021 hearing that "You're going to take the deposition of the plaintiff as to matters that are *relevant* to this case." At the same time, he stated "there shall be **no objections**, no instructions not to answer, except on the grounds of attorney/client privilege. Page 12, lines 10-11. Both of these directives from the Magistrate are in direct contravention to his directives issued during the taking of Plaintiff's deposition. The Magistrate, prompted by defense counsel, then had Mr. Antolini verify his identity right then and there. It was a sight to behold as Mr. Antolini was told by the Magistrate to hold up his identification. He then asked when the photo was taken.

7.        Thereafter on April 19, 2021, Plaintiff's deposition was held and the following is just a snap-shot of what transpired. For the full viewing, the entire transcript has been filed on Pacer. *See* Dkt. No. 167-1.:

"Q. Mr. Antolini, are you familiar with a condition by the name of *alcoholic cerebral degeneration?*
Q. What is it?
Q. Mr. Antolini, what is it?
Q. Okay. Can you describe what it is in laymen's terms?
Q. ***Is that killing of the brain cells caused by alcohol consumption?***
Q. Have you ever been diagnosed with alcoholic cerebral degeneration?
Q. Mr. Antolini, my question was –
Q. I need to ask you because you're sitting here. My question is: Have you ever been diagnosed with alcoholic cerebral degeneration?
Q. *Mr. Antolini, do you have a history of alcoholism?*
Q. Can you tell me about it?
A. No.
Q. Mr. Antolini, respectfully, you're being deposed right now. So unless your attorney instructs you not to answer the question.[4]
Q. Mr. Antolini, unless your attorney instructs you not to answer – Q. *Unless your attorney tells you not to answer* –
Q. --You have *an obligation to* answer the question, Mr. Antolini.
Q. Mr. Antolini, do you have a *history of alcoholism?*
Q. Can you tell me about it?
Q. *Have you ever been treated for alcohol substance abuse?*
Q. *Has your doctor ever directed you to abstain from alcohol*?
Q. ***Do you know what abstain means?***
Q. What about ***right now;*** do you have any other alcohol right now besides wine?
A. No.
Q. Mr. Antolini, when was the *last time* that you dined out either for a meal or to have a cocktail?
Q. And at the end of the notes, it also says that Dr. Swan spent more than half of this 30-minute visit in counseling on the importance of alcohol abstinence. Do you see that?
Q. ***Did you follow Dr. Swan's advice, Mr. Antolini?*** --------

---

[4] Defendant's counsel knew or should have known that Affiant was limited in my ability to do so by court order.

Q. And it also says here that, quote, Dr. Swan spent more than half of this 40-minute visit in counseling the importance of alcohol abstinence.

Q. ***Did you follow Dr. Swan's advice?***

Q. *So if Dr. Swan is advising you the importance of alcohol abstention*, **would you follow** that advice?

Q. Do you remember ___*hearing*___ Dr. Swan speak when you go to visit him?

Q. ___***Mr. Antolini, do you currently drink alcohol***___?

Q. Mr. Antolini, I'm showing you progress notes dated January 21, 2020.

Q. It says here, quote, you still have issues with names. Stable, not worse.

Q. So were you still having issues with memory loss -- with memory loss or with memory recall?

Q. It says here that you were *drinking minimally*. Is that referring to alcohol consumption?

Q. And it says that at dinner, **you** *still drink* diluted sake, sometimes at lunch, one or two -- -- total, not a full drink each time.

Q. *And that was because you were recovering from alcohol consumption?*

Q. *Mr. Antolini, it says here that Dr. Swan spent more than half of this visit counseling the importance of alcohol abstinence.*

Q. ___***But did you follow this advice at the January 21, 2020 visit?***___

Q. Mr. Antolini, I understand that you fractured your left hip?

Q. Can you repeat that?

Q. You said you had a hip replacement?

Q. Why did you get a hip replacement?

Q. Okay. You fractured your hip?

Q. *How did you* fracture your hip, Mr. Antolini?

A. I went from my scooter to a park bench.

Q. *Why* did you get a hip replacement?

Q. Mr. Antolini? Mr. Antolini?

Q. **Do you recall __why__ you fractured your hip**?

Q. Mr. Antolini, do you ***currently*** drink alcohol?

Q. You have a glass of wine or two a day?

Q. And besides a glass of wine or two a day, do you have any other alcohol

A. No.

Q. -- a day?

A. No.

Q. How many *drinks on average do you have per week*, Mr. Antolini?

Q. Do you drink any other alcohol besides wine?

Q. What about right now; do you have any other alcohol besides wine?

Q. Mr. Antolini, when was the *last time* that you dined out either for a meal or to have a cocktail?

Q. Where did you go?

Q. Mr. Antolini, how often do you dine out in __2018__?[5]

Q. I know it's hard to think of an exact figure, but just use -- use your -- use your best judgment?

Q. Mr. Antolini, how many times have you dined out in *2021*?

Q. Mr. Antolini, when you normally go out to eat, do you go by yourself or do you go with    other people?

Q. Mr. Antolini, how much would you normally *pay for a meal* or for a night out?

Q You know, what about right now; how much do you *currently pay* for a meal or for a night out when you go out?

---

[5] The instant matter was not filed until September 28, 2019 (Dkt. No. 1).

Q. Was that number the same in 2019?

Q. And that would have been your same range, $50 to $100 in *2018?*

Q. Mr. Antolini, do you ***ever*** go *out for cocktails?*

A. On occasion. Not cocktails.

A. Not cocktails. Like I said, either wine or wine spritzer.

Q. Do you have any favorite places that you like to go to drink?

Q. *When did you stop going out for drinks?*

Q. Was that, you know, before your -- you know, more than *ten years* ago?

Q. You said that you stopped going out for cocktails over ***ten years ago?***

A. Yes.

Q. And you said drinks or cocktails, right?

Q. You don't really go out for drinks or cocktails? Is that what you said?

A. You lost me. What was the question there?

Q. I had asked, you know, do you normally go out for cocktails or drinks?

A. No.

Q. Okay.

A. No. Drinks, no.

Q. **When was the last time that you went out for cocktails or drinks?**

Q. And you said it was more than *ten years ago*? Is that what you said?

Q. Okay. Why does that number stand out? *Why more than ten years?*

A. That's when I became disabled.

Q. *And after you became disabled, you stopped going out for drinks and for cocktails?*

Q. So you don't -- so after your *disability, you stopped going out for cocktails and drinks*?

Q. Sir, Mr. Antolini, **I just want to be clear*. When --was the last time that you went* out for *cocktails or drinks?***

A. Here we go again. I just said that. Right now I *drink wine.*

Q. *And when was the last time that you went out for a glass of wine?*

Q. Where do you normally go out to drink?

A. I don't go anymore.

Q. **When <u>you used to go, before you stopped,</u>** did you have any favorite places to go out to drink?

Q. Mr. Antolini, how much would you normally pay for a meal or for a night out?

Q. You know, what *about right now; how* much do you currently pay for a meal or for a night out when you go out?

Q. Either for a meal or for a night out?

Q. Mr. Antolini, do you ever go out for cocktails?

A. On occasion. Not cocktails.

Q. Can you say that again?

A. Not cocktails. Like I said, either wine or wine spritzer.

Q. You said you normally go out to drink only for wine or a wine spritzer?

A. <u>Not cocktails. Like I said, either wine or wine spritzer.</u>

Q. Do you have any favorite places that you like to go to drink?

Q. <u>*When*</u> did you stop going out for drinks?

Q. You said that you *stopped going out for cocktails over <u>ten years ago</u>*?

A. Yes.

Q. *And you said drinks or cocktails, right?*

Q. *You don't really go out for drinks or cocktails? Is that what you said?*

Q. *When was the last time that you went out for cocktails or drinks?*

Q. And you said it was more than _ten years_ ago? Is _that what you said?_

_Q. So, Mr. Antolini,_ **if I can just ask you again so we have** _a clear record, is it your testimony --_ _here today that you don't go out for drinks?_

_Q. And is it your testimony here today that you stopped going out for drinks about ten years ago,_ _when you were diagnosed with your disability?_

Q. Do you recall how often you went out for drinks in _2020_? Can you use your best estimate, if you can -- use your estimation?

Q. What about in 2019?

Q. Okay. And what about in _2018_; how often did you used to go out for drinks in _2018?_

Q. So is it your testimony **_here today_** that you have no specific plans to go out for drinks and you have no specific plans to go out for a meal?

Q. Can you tell me more about your future plans to go out to dine out

Q. Okay. **And what about future plans to go out to _drink?_**

Q. So do you have any specific plans to get any cocktails in the future?

A. I don't drink cocktails.

Q. I'm sorry. What I meant by that was, do you have any specific plans to get drinks in the future?"

   The deeply disturbing abuse did not let up:

"Q. Mr. Antolini, are you familiar with a restaurant by the name of Coquette?

A. Who?

A. Like I said, I don't keep a diary.

Q. Mr. Antolini, my question was if you're familiar with a restaurant by the name of _Coquette_?

A. I don't keep a diary.

Q. Mr. Antolini, I'm not asking whether or not you keep a diary.

A. I have no idea where you're going. What are you trying to do? What does it have to do with _Madame X_?[6]

_Q. **Mr. Antolini, I'm going to ask the questions and you're going to answer them.**_

**Q. Okay. Mr. Antolini, let me be clear with you -- that the judge has given me five days to take your deposition.**

Q No. He gave me Monday, Tuesday Wednesday, Thursday, Friday. I have – _I have all the_ _time to_ _sit and take your deposition_. ……………………………

Q. Mr. Antolini, do you have any _memory loss issues?_

A. Yes.

Q. Can you tell me about them?

A. I don't know. _You subpoenaed my record._

Q. Mr. Antolini, can you tell me about your memory issues?

A. I told you, look up my medical records. You have copies

Q. No, no. Mr. Antolini, I'm asking you --the no, no.

Q. -- I'm asking you, sitting here today, please, can you tell me about your medical -- _your memory loss issues_?

Q. Tell me? Tell me about your medical history and your _memory loss_ issues?

A. What kind?

Q. What kind of memory loss issues do you have?

Q. Okay. These are progress notes from your doctor, Dr. Matthew Swan.

Q. In your progress notes dated **July 18, _2017_ there** are some notes that your doctor had made. I'm going to read some of them to you, okay?

Q. Here, it says, Memory is worsening. Has difficulty recalling information.

A. Correct.

---

[6] MADAME X, located at 94 W Houston St, New York, NY 10012 is the subject facility at the center of this lawsuit.

Q. Spontaneous recall is difficult. He is delayed in recalling information. He was told by Social Security M.D. that he has _dementia._

Q. Can you tell me a little bit about the _memory loss issues_ Dr. Swan is referring to?

MR. FINKELSTEIN: Okay. And, Susan, what was his answer, please?

MR. MIZRAHI: No. I'm not asking for the answer, and I'm going to –

MR. FINKELSTEIN: I am. I am.  I'm asking for the answer.

MR. MIZRAHI: Madam Court Reporter, I'm ready to continue. **_You don't have to repeat it._**

MR. FINKELSTEIN: I want to hear his answer, Susan, please. And get this all on the record, _that he's refusing me to hear the testimony that's already in the record_. I'd like to hear his answer, please.

Q. Can you tell me about the difficulty in **spontaneous recall** that Dr. Swan was referring to?

Q. Mr. Antolini do you suffer from **_memory loss issues_**?

A. Yes.

Q. Mr. Antolini, do you have difficulty **_recalling information_**?

A. Sometimes.

Q. Q. Okay. Do you have difficulty in spontaneous recall Mr. Antolini?

Q. **_It says here that you were told by Social Security that you have dementia?_**

A. Yeah.

Q. Can you tell me more?

A. I don't know.

Q. _Have you ever been diagnosed with dementia?_

A. That's why I have THE WITNESS: Disability.

Q. Do you suffer from dementia?

A. I'm not a doctor. I don't know.

Q. _Have you ever been diagnosed with dementia?_

A. I have no idea what my records say. You don't know about me?

Q. Mr. Antolini, it says -- it says here that, quote, He drinks a little sake with lunch and dinner mixed with water. Last admission for detox was about two years ago.

Q. **_Why do you dilute_** -- can you tell me about the _diluted sake_ that Dr. Swan is referring to?

MR. FINKELSTEIN: Objection on the grounds of perversion.

Q. **_Why do you dilute your sake with water?_**

A. Because I need water.

Q. **So why don't you just drink water?**

A. This is America. I have the right to drink what I want to do. All right?

Q. You received assistance for alcohol _substance abuse issues_, Mr. Antolini; is that accurate?

Q. **Were you ever -- were you ever admitted for alcohol substance abuse issues?**

A**.** Yeah.

Q. Can you tell me about it?

Q. Have you ever -- can you tell me _about the admission for detox_ --

Q. Mr. Antolini, it says here that, quote, you are concerned about memory.

A. Yeah.

Q. Are you _currently_ concerned about your _memory loss_ issues?

A. No.

Q. Do you currently suffer from _memory loss issues?_

A. No.

Q. Mr. Antolini, it says here that you had suffered from cognitive impairments—Potentially related to **longstanding alcohol use.**

Q. Can you tell me about these cognitive impairments?

Q. Have you ever -- have you ever suffered from cognitive impairments?

Q. Is there anything else that you recall about your visit with Dr. Swan on <u>July 18, **2017**</u>?

A. What are you talking about?

Q. Is there anything else that you remember about that visit on July 18, *2017*?

A. What do you want to know.

Q. Anything else that you remember about that visit?

Q. I'm going to read -- ***I'm going to read more of the progress notes.*** Mr. Antolini, it says here that, quote, Memory was..

Q. Mr. Antolini, it says here, quote, your <u>memory is worsening</u>. You're having trouble with concentration. **You were to repeat a brain MRI,** and you were referred to obtain labs for reversible dementia that <u>**you did not complete**</u>.

Q. It also says here that, according to your wife**,** that you were forgetting many things.

A. You know more than me

Q. ***Is that accurate?***

Q. It also says here, Mr. Antolini, that you have difficulty recalling information –

Q. -- in that you suffer from <u>*intermittent staring spells*</u> –

Q. -- lasting as much as ten minutes.

Q. Do you -- do you still suffer from those intermittent staring spells?

Q. <u>**Mr. Antolini, why didn't you complete the labs for your dementia?**</u>

Q. Mr. Antolini, it says here that you were instructed to -- referred to obtain labs for reversible dementia but you did not complete this workup. **Why didn't you** --?

A. I have no idea what you're talking about.

Q. Do you see where it says that right here, that you were referred to obtain labs for reversible dementia?

MR. FINKELSTEIN: Asked and answered three times. Objection. Harassment. Annoying. He said he has no idea what you're talking about, counselor, and I think we gotta get the judge on the phone. This is insane. If you're going to continue to harass, let me know; otherwise, I'm going to have to get him on the phone *even though he said don't call*. This is crazy.

**It is extremely important to note that throughout defendants' counsel's sordid questioning, Plaintiff's counsel's hands were tied by the previous directives of Judge Aaron made earlier on the record at the deposition. The following is excerpted from the mid- deposition telephone conference with the court:

> "THE COURT: Mr. Finkelstein, I will give you a very, very brief opportunity to respond, ***because you already know I'm going to rule.*** Go ahead.
> 
> MR. FINKELSTEIN: With regard to the other lawsuits, this is the only one that he just brought up with you. We object. He has no foundation, et cetera, et cetera, and also, based on privilege. I don't know where he's going to get involved with other lawsuits and my relationship with Mr. Antolini and asking questions about lawsuits,
> and it's all a matter of public record. So I'm not sure what other lawsuits have to do with this **case, Your Honor. Each case stands on its own. *But maybe it's all for naught what I'm saying, because you already said you know how you're going to rule, s***o.[7]

---

[7] *See Liteky v. U.S.*, 510 U.S. 540 (1994) ("It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that "extrajudicial source" is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. <u>A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment.</u> That explains what some courts have called the "pervasive bias" exception to the "extrajudicial source" doctrine. See, *e.g., Davis v. Board of School Comm'rs of Mobile County,* 517 F.2d 1044, 1051 (CA5 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976)).

THE COURT: With respect to the issue of other lawsuits, that's a factual matter. It may be a matter of public record, it may *be a waste* of the seven hours you're allotted, and your client will have whatever memory he has of -- **my recollection is there are many other lawsuits**, and he'll remember off the top of his head what he remembers. This is all --.m,

MR. FINKELSTEIN: When you say --

THE COURT: Let me finish.

MR. FINKELSTEIN: Oh, sure.

THE COURT: No, Mr. Finkelstein. I'm still speaking.

MR. FINKELSTEIN: I beg your pardon. I thought you were finished.

THE COURT: He is not -- you are not permitted to say any other word other than the **word objection**. That's all you're allowed to do. And then your client is going to answer the question unless it's privileged

THE COURT: No. Let me be clear. <u>It is not doing your best</u>. *<u>You are not to say any</u> other word <u>except objection</u>.*

MR. FINKELSTEIN: Yes. Yes, I have a question. When you say it's a factual basis, these other cases, what do you -- how is -- I don't understand what that means. What fact –

THE COURT: It is a fact. It is a fact. There's nothing privileged about whether or not there's other litigation.

MR. FINKELSTEIN: And what does other litigation have to do with this case?

THE COURT: *But if he wants* **to** *waste* **his** time asking about public record information about other lawsuits, he's allowed to **waste his** time doing that.

MR. FINKELSTEIN: **Well, that's acting in** *bad faith* **then. That's acting in** *bad faith* **then**.

THE COURT: It is not. Relevance is not a valid objection. That is not –

MR. FINKELSTEIN: ***Bad faith is*** --

THE COURT: That is my ruling. If you disagree with my ruling, so be it. You're allowed to disagree with my ruling, but I'm the judge."

**HOWEVER, Rule 30(3)(A) does not speak to the behavior of the deponent, but whether the questioning *of the witness* is *proper*. The barometer is not if the questioner is 'wasting his time', but rather if the questions are not in accord with the Rule. As such, incessant questions about other lawsuits, questions about things that have nothing to do with the instant matter, questions that humiliate, questions that have no bearing on the facts of the case, and questions that have been answered multiple times, are made in **bad faith**, or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. *See* Fed. R. Civ. P. 30. Plaintiff detailed same in his motion for a protective order and to terminate. *See* Dkt. No. 177.

Judge Aaron continued:

"THE COURT: ***<u>There are going to be no other calls after this one today</u>***. If you can get anyone you want on the line.

THE COURT: Mr. Finkelstein, was there something you didn't understand about my prior ruling?

MR. FINKELSTEIN: No, I understood it 110 percent. But I've been doing depositions for God knows how many years, state and federal. If the witness doesn't know something, Your Honor, and I say this very respectfully; I mean, the most respect I can -- I can muster, you don't get to continue to ask questions if somebody doesn't know something. If you don't know the

answer to a question, you don't know it. But as I said on my objection -- by the way, I didn't say he can't answer it. I never precluded him from answering the question.

THE COURT: Right. But that is a classic speaking objection. Classic. You're allowed to say the word objection. That's it. There will be no -- there will be no further telephone calls to me during this deposition. I'm saying this, however: I'm going to get a copy of this transcript in the event that the speaking objections continue, and I will impose sanction for each and every speaking objection you make, Mr. Finkelstein. I haven't figured out what the-- what the number is, what the dollar figure is, but it will be significant. I will take no further phone calls today. I'm not taking any other phone calls. I've already ruled. ___*If I thought there were*___ ___*harassment of any kind going on here, then I would certainly not be*___ ___*making the ruling I'm making.*___ Instead, what I'm making is a very clear ruling. If there's any attorney/client privileged information being sought you're allowed to give an instruction not to answer. Otherwise, you're a potted plant."

<u>Code of Conduct for United States Judges</u>[8]

United States Judges in effectuating their duties and adhering to their responsibilities are bound by their code of conduct. *See* **Canon 3A (5): In disposing of matters promptly, efficiently, and fairly, a judge must** demonstrate due regard for the rights of the parties to be heard and to have issues resolved without <u>unnecessary cost or delay</u>. *A judge should monitor and **supervise cases** to reduce or eliminate dilatory practices, avoidable delays, and <u>unnecessary</u> costs.* Judge Aaron's refusal to take any calls for rulings during Plaintiff's deposition is indicative of his willfully or negligently failing to perform assigned duties or performing them in a culpably inefficient manner as the responsibility is his and delegable to no one else.

**8.**         The demeaning, abusive and humiliating questioning continued, (see page 253 onward of Plaintiff's Deposition). Then came the questions regarding Dino Antolini's relationship with his counsel (affiant) and what he did or did not know about my personal life. The docket reflects that, <u>over a year ago</u> [Dkt. No. 38] on June 10, 2020, Mr. Antolini and affiant responded to Court-ordered interrogatories addressing "fraud on the court" allegations. As such, during the deposition, the undersigned directed Mr. Antolini not to respond to questions that invaded the attorney-client privilege, including affiant's arrest warrant which defendants' counsel put up on everybody's monitor (the deposition took place virtually). The deposition transcript indicates that defendants' counsel would not cease, even though I asked him numerous times to continue *sans* my personal business, which he refused. The deposition was terminated pursuant to Rule 30**,** <u>as I had given notice of my intention to do so throughout much of the deposition.</u>

---

[8] https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges#:~:text=Canon%203A(5).,without%20unnecessary%20cost%20or%20delay.

9.         The ongoing and never-ending pattern of behavior displayed by Judge Aaron reflects

the judge's inability to preside over this case fairly. For example, On October 18, 2020 Plaintiff

filed his Motion for Default Judgment against defendants Eddie C K Chung and C&S Millenium

Real Estate LLC, the owners of the building.9*   Despite bona fide affidavits of service upon Mr.

Chung, the Magistrate issued his report and recommendation denying the default. Since that time,

I have been unable to obtain any discovery, including 1) First Request for Production of

Documents, 2) First Request Rule 26 on Expert(s), 3) First Request for Interrogatories, 4) Fact

and Expert Witness Interrogatories. Further, he has *prevented the taking defendants depositions.*

The Magistrate has stayed Plaintiff's Discovery numerous times. In fact, discovery continued to be

stayed as ordered on July 3, 2021. *See* [Dkt. No. 189]: "Since Plaintiff is <u>continuing to pursue a</u>

<u>default judgment</u> against these Defendants, the Court finds that, regardless of the stay, obtaining

discovery from these Defendants at present <u>would be inappropriate</u>." Affiant is at a loss to

understand how discovery from these named defendants would be inappropriate simply because

a motion for default was pending. Many months later on in the case, it became apparent.

Defendants Eddie CK Chung and C&S Millenium Real Estate LLC are represented by the very

same lawyers as the other two defendants. Another blatant showing of bias and impartiality of the

Magistrate was evidenced after Judge Daniels recent decision of July 20, 2021, wherein he

denied Plaintiff's motion for entry of a default judgment, *inter alia*. Subsequently, on July 23, 2021

during a telephone conference with the Court, I again asked for the stay of Plaintiff's discovery be

rescinded. He flat out denied the request without reason or explanation*, even though he had*

*previously continued the stay awaiting this very decision of Judge Daniels and using the pending*

*decision as his reason for continuing to stay discovery*. It is now some seven months since these

two defendants filed their answers and Plaintiff has still not received one scintilla of discovery. Yet,

---

9  The landlord defendants defaulted in bad faith. *See* Dkt. No. 131. Despite co-defendant Amy McCloskey notifying defendant
   owner of the building Eddie CK Chung about the lawsuit, he simply ignored it for over a year.

Judge Aaron has now threatened on two separate occasions that he will seek to dismiss Plaintiff's lawsuit for failure to prosecute! Recusal is appropriate not just where there is evidence of actual bias, but even where there is an appearance of prejudice. *See* People v. Zappacosta, 77 A.D.2d 928, 930 (2d Dept. 1980) ("Sensitive to the imperative that we avoid any situation which allows even a suspicion of partiality, we believe that the public interest requires that the appellant's recusal motion should have been granted[.])" (infernal citations omitted). At this time, the Judge's recusal is more than appropriate, it need be mandatory.

10.      Over the course of practicing law, I have appeared before various Judges hundreds and hundreds of times. At each and every such appearance, there has never been a time that I was not asked, in some form 'Counselor, what about the probability of settling this case', or 'have you spoken to your adversary about the possibilities of settlement', or, 'would a conference help in getting the case resolved', or 'let's schedule the case for mediation' or 'how can I help to resolve the case', or what do you attorneys' think would best help put the case to bed'? In over a year (thirteen months) and approximately ***fourteen conferences with the court*** and over forty letters to the Court along with multiple memo endorsements, orders, and decisions, (the docket now stands at two hundred fourteen entries (214), the Judge has **NEVER** ever uttered one word about any settlement, resolution, or productive discourse of this lawsuit. Even beyond settlement, the Judge has simply never sought to have the parties engage in any productive dialogue. For example, the issues in the case center on the disability inaccessibility and discrimination at defendants' facility. Instead of working to facilitate the exchange of architectural expert discovery or financial discovery, the Judge has inexplicably done the opposite. *See* Canon 3A (5): In disposing of matters promptly, efficiently, and fairly, a judge must demonstrate due regard for the rights of the parties to be heard and to have issues resolved without unnecessary cost or delay. A judge should monitor and supervise cases to reduce or eliminate dilatory practices, avoidable delays, and unnecessary costs.

10.      On May 17, 2021 in response to the Judge's order to show cause as to why I should

not be sanctioned for violating his rulings during Mr. Antolin's deposition, [DE 169] Affiant sought

an adjournment to respond. My reason was two-fold, i.e., I was not feeling well and second, for

the observance of my religious holiday. The response from the Judge was nothing short of

shocking; the Order of June 1, 2021 (Dkt. No. 176) read as follows:

> ENDORSEMENT: **Although the Court _is aware that_ Plaintiff's counsel has been actively litigating other cases in this District throughout the period since the Court issued its Order to Show Cause on May 6,** 2021, including the period after his initial extension request of May 14, 2021(_see, e.g.,_ _Antolini v. Rosenblum_, No. 19-CV-06264 (LGS) (JLC); _Antolini v. Nieves_, CV-07645 (VSB) (RWL)), this request is GRANTED."

This is clearly extrajudicial conduct and for lack of better phraseology, affiant Stuart H.

Finkelstein Esq., is being stalked by this Judge. Why would there be a need by _any_ Judge to

track down an attorney to ascertain his religious beliefs and personal health when that attorney

seeks a simple short adjournment? This behavior, in and of itself, is appalling. In addition, the

Judge admonished me for not 'consulting' with my adversary before requesting the adjournment,

despite previously knowing on other occasions that my adversary was recording my phone calls

(_See_ Dkt. No. 176) which is, at the minimum, a violation of ethical conduct.

This extrajudicial conduct for affiant to be shadowed by the Judge is unfortunate. As

such and for purposes of section 144 of Title 28 of the U.S. Code, the allegations of Plaintiff's

counsel's declaration and certificate of good faith and must be accepted by the court as true, and

the court must act in accordance with the mandate of section 144 and recuse itself or be

disqualified. U.S. v. Sykes, 7 F.3d 1331 (7th Cir. 1993). The alleged bias must result from an

extra judicial source or the judges remarks reveal such a high degree of favoritism or antagonism

as to make fair judgment impossible. Liteky v. United States, 510 U.S. 540, 554 (1994). In

evaluating the supporting declarations, the court must assume that the factual averments are

true, even if the judge believes them to be false. US. V. Balistrieri, 779 F2d 1191, 1199, (7th Cir.

1985). A judge should recuse when "a reasonable person, knowing all the facts, would question

the judge's impartiality." Roemer v. Booth, 710 Fed.Appx. 36, 38 (2d Cir. 2018) (citing United

States v. Yousef, (2d Cir. 2003)) (internal quotation marks omitted); _see also_ 28 U.S.C. § 455(a).

Moreover, Title U.S.C. §455(a) requires a judge to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." Under the statute, recusal is required in specific contexts as provided for §455(b)(1) and wherever, "an objective, disinterested observer fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal." United States v. Yousef, 327 F.2d 56, 169 (2d Cir. 2003) (internal quotations and alterations omitted). The pertinent trigger for recusal is the "appearance of partiality," Chase Manhattan Bank v. Affiliated FM Ins. Co., 343 F.2d 120, 128–30 (2d Cir. 2003), and a denial of a motion to recuse is reviewed for abuse of discretion. Id. at 126. Cox v. Onondaga County Sheriff's Dep't, 760 F.2d 139 (2nd Cir. 2014). The Judge has far exceeded any 'appearance of impartiality' beyond any reasonable doubt and must be disqualified.

**Canon 3:** A Judge Should Perform the Duties of the Office Fairly, Impartially and Diligently:

The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. See Scott v. Brooklyn Hospital, 93 A.D.2d 577, 580 (2d Dept. 1983), and the appearance of impropriety should be avoided to foster respect for the judiciary. People v. Zappacosta, 77 A.D.2d 928 (2d Dept. 1980); Matter of Murphy, 82 N.Y.2d 491, 495 (1993). It is proper for a judge to recuse himself from a case where his impartiality is rationally subject to question. See Skripek v. Skripek, 239 AD2d 488 (2d Dept. 1997). This is what need happen here.

10.     In June of 2020, Affiant furnished a HIPPA authorization to defendants' counsel for Plaintiff's medical records. Affiant later found out that the defendants' lawyer *altered* the HIPPA authorization. Defendants' counsel checked off the boxes calling for *Alcohol/Drug Treatment, Mental Health Information and HIV-Related Information and also sought Mr. Antolini's Dental Records. See* Dkt. No. 73 (detailing same). I attempted to make a record of their improper alteration the HIPPA authorization during a discovery conference call with the Court on October 14, 2020 (in between Dkt. No.'s 86 & 87) but the Judge refused me the right to do so. The Judge

did this, even though he was aware of defendants' counsels' impropriety and did nothing during the conference, or for that matter, to ever to address the transgression. Defendants' counsels' actions amounted to a willful and criminal violation of HIPAA rules.[10] Repetitive motions were made seeking Plaintiff's medical records, *even after receiving those that spoke directly on point to his disabilities* as alleged in the Complaint. Subsequently, the defendants' counsel was also given the proverbial 'okay' by Judge Aaron to obtain Mr. Antolini's **psychiatric records along with his dental records, HIV-related information and alcoholic/DRUG TREATMENT records** (Dkt. No. 114) ----all of this for Plaintiff's lawsuit complaining of violations of the Americans with Disabilities Act. Because defendants also wanted ALL of Mr. Antolini's medical records *from birth, some 64 years ago,* and even though his HIPPA authorization was furnished multiple times, the Magistrate sanctioned Affiant Nine Hundred Dollars ($900.00) *while at the same time ignoring defendants' counsel's alteration of the HIPPA authorizations*. With those records, the Judge enabled the defendants' lawyers to humiliate Plaintiff Antolini at his deposition. Further, at a discovery conference held on October 14, 2020, (in between Dkt. No.'s 86 & 87) the Judge demeaned Affiant because Mr. Antolini was only able to remember his current treating physician rather than every physician he had ever been treated by. *See* Transcript at 6-11, 13. The Judge began his adversative questioning of me about Plaintiff's medical records, suggesting *perjury was afoot,* while at the very same time advocating on behalf of the defendants:

"THE COURT: Okay. But this is document production, and we haven't yet gotten to depositions. If there's *perjury afoot,* I suppose you haven't asked Mr. Antolini yet under oath whether he has any additional documents -- and he's going to answer that question. If Mr. Finkelstein is misrepresenting the facts, then he has serious problems with his license to practice generally and in this court. And if Mr. Antolini lies under oath, there are repercussions for that.
THE COURT:  We're now moving onto interrogatory number one. Interrogatory number one says, "State the name and address of each healthcare provider who has examined or treated plaintiff." And, Mr. Finkelstein, it defies logic that there'd be a single doctor at Mt. Sinai Hospital, given your client's medical conditions. So explain that to me, please.
MR. FINKELSTEIN: I don't know what the question is, Judge. I don't know what the question is.
THE COURT: Are you ready? I'm going to read it to you again, *and I'll read it slowly*.
MR. FINKELSTEIN: Okay.

---

[10] *See* 45 C.F.R. § 164.512(e) and OCR's Frequently Asked Questions.

THE COURT: Interrogatory number one, "State the name and address of each healthcare provider who has examined or treated plaintiff."

MR. FINKELSTEIN: Okay. And I provided that, Dr. Simon over at Mt. Sinai Hospital.

THE COURT: Okay, now what you said -- I'll read what you said. You said Dr. Matthew Swan, Mt.

MR. FINKELSTEIN: Swan. I'm sorry. Right.

THE COURT: -- Hospital.

MR. FINKELSTEIN: Sorry.

THE COURT: You're telling me that, given your client's medical conditions, he's had a single healthcare provider who has examined or treated him?

MR. FINKELSTEIN: To my knowledge, that's his treating physician, has been for a number of years, number one. Number two—*and I also want to make part of the record*, Judge, if you'll let me do that, please--

THE COURT: ***No, no***, we're going to stick with my agenda, just like I did with Mr. Mizrahi.

MR. FINKELSTEIN: Okay.

THE COURT: Now, you've got -- let me finish.  You've just thrown in a very -- you've switched things up on me. You said this is his treating physician. That wasn't the question. The question is, "State the name and address of each healthcare provider who has examined or treated plaintiff." And you list a single doctor who you say is his treating physician. Okay. So that's his treating physician. But the question asks for each healthcare provider who has examined or treated plaintiff.

MR. FINKELSTEIN: I don't know of any, your Honor.  I don't know of any.

THE COURT: Okay. But -- MR. FINKELSTEIN: That's all that I –

THE COURT: No, just stop. The question isn't what you know. The question is what your client knows.

THE COURT: Your client doesn't know other doctors that have examined or treated him?*

MR. FINKELSTEIN: That's the only one that stands out in his mind. I've had numerous discussions with him in person, over the phone; and that's correct, Judge, that's the only one that he's aware of.[11]

THE COURT: All right, but, again, you've now thrown something else in there, Mr. Finkelstein. You're –

MR. FINKELSTEIN: What's that, Judge.

THE COURT: -- *talking about what stands out in his mind*.[12]

MR. FINKELSTEIN: Right.

THE COURT: But that is not the question. The question is what doctors examined or treated him. So, Mr. Mizrahi, now you're going to tell me, I think, that in the records that you have, other doctors are listed; am I right about that?

MR. FINKELSTEIN: No, I'm not going to say that at all. I'm going to say –

THE COURT: I didn't ask you. I wasn't asking you, Mr. Finkelstein.

MR. FINKELSTEIN: What are you asking me, Judge?

THE COURT: <u>You need to stop talking</u>.

Mr. Mizrahi, do you have evidence that there are other doctors who treated him?

MR. MIZRAHI: Your Honor, in plaintiff's 13-page  production, plaintiff admits to receiving treatment from numerous other medical professionals.[13]

THE COURT: So, Mr. Finkelstein, how can that be that under oath -- well, have these things been sworn, Mr. Mizrahi?

---

[11] It is striking to review the sheer disdain that the Judge approached Plaintiff and his counsel with. Further, throughout the entire conference, the Judge, though obviously allowed to inquire into any matter before the court, went far afield of any normal judicial questioning. The Judge gave his personal opinions and called Plaintiff and his counsel liars. The personal animus and misguided and unadulterated attack on Plaintiff because he only remembered his current physician as an elderly man with numerous cognitive impairments amounted to nothing short of a judicially-led persecution.

[12] The irony of the judge's crusade is that the interrogatory at issue concerns exactly what was "in Plaintiff's mind. If Plaintiff is unable to retrieve previous records because he quite literally does not remember the names of prior doctors, then what is in his mind is of extreme importance.

[13] Plaintiff did not 'admit' anything. His medical records, that he had himself seen or produced, showed Plaintiff's medical history.

THE COURT: Yes, so 80-2 at page 9 of 10. So, Mr. Finkelstein, how can your client swear under oath before you -- you're the notary -- listing a single name when the documents that he produced have other names?

MR. FINKELSTEIN: I didn't hear the last part you said. With another name? I didn't hear that, Judge. Sorry.

THE COURT: They have other names. The thirteen pages themselves list other names.
MR. FINKELSTEIN: Well, I didn't hear him say that, Judge, now, but if there are other names in the reports, in those medical records, then those are his other names. When I say to you that's the only one that stands out, that's the only one that he has a recollection of is this Dr Swan.
THE COURT: All right, so what Mr. Mizrahi has, I think -- **and I _haven't seen_ these 13 pages - but he has objective proof that what Mr. Antolini swore to in response to interrogatory number one _is_ false.**[14]
MR. FINKELSTEIN: I don't think he has any proof of that at all, just what he's saying. If in fact there are other named doctors in that report, in those medical records and I didn't see them, he is free to depose him subpoena them, ask him for an authorization. I don't know of, and neither does Mr. Antolini; he hasn't looked at 13 those medical records. ***I got them through** (indiscernible) **the doctor.**_

THE COURT: Mr. Finkelstein, you said that you haven't seen the documents. You produced the documents.
MR. FINKELSTEIN: I produced a 13-page report, medical record -- I'm sorry, it's not a report -it's thirteen pages of a number of his visits for the last number of years. And it confirms the ataxia, it confirms the surgery, it confirms all of his maladies that he -- not all, but those two maladies that we're claiming and their sequelae. Anything else beyond that, which in and of itself proves a disability under the ADA, is my problem at trial if in fact the jury and then the judge, as a matter of fact, a matter of law, says he doesn't have a disability. But that's my burden at trial. I've made out the prima facie part, and if he wants anything else, let him send me an authorization that _he doesn't alter the HIPAA authorization asking for his **mental** records, asking for his **dental** records. I don't know how a **dentist record** has anything to do with a disability under the ADA._

**THE COURT: All right, so you're obfuscating. All I can say is, Mr. Mizrahi, you have ample fodder, for lack of a better term, for cross-examining Mr. Antolini and showing that his response to interrogatory number one is false. And you'll take his deposition, and, for lack of a better term, the chips will fall where they may. If you have other relief you want to seek after you take his deposition, you can seek it. But obviously, Mr. Finkelstein's making a representation here that this is all his client recalls, and you'll walk him through the thirteen pages he produced, and you'll take his deposition; and, again, whatever relief you want to seek thereafter, you can seek."

      This last blurb above illustrates the Judge's personal campaign where both Mr. Antolini and Affiant are the targets. To read the Judge's words is to observe a sort of coaching, a playbook on how the Judge thinks that defendant's counsel should proceed in order to really nail Plaintiff and his counsel to the wall. Affiant cannot explain the 'why,' and neither should I have to. This askew behavior has no place in our system of law.

---

[14] This predisposed biased unsupported conclusionary conduct has been throughout the case. Not only does the Judge declare that Mr. Antolini is a liar, including Affiant as the supporting cast, he has now become a finder and arbiter of fact during the discovery phase of the lawsuit.

Presently, the Judge has now created yet a second set of circumstances to sanction Affiant and/or Plaintiff: the issue of the sickening deposition of Mr. Antolini, and now a second deposition of Mr. Antolini being adjourned due to his wife's illness, and whether sanctions be levied for adjourning it because of his wife's illness. All the while, Plaintiff has been prevented from obtaining **ANY** discovery of the defendants for months with no recognizable rationale.

**11.**      On June 7, 2021 Plaintiff filed his Rule 30(d), Rule 30(d)(2), Rule 30(c)(2), Rule 30(d)(3), and Rule 26(c)(1) Motion. *See* Dkt. No. 177. **Attached Exhibit.** The Motion sought relief from a defendant's lawyer, who, for lack of a better description, abused the hell out of Mr. Antolini at his deposition. Subsequently on June 19, 2021, the Judge issued his Order, apparently consolidating both affiant's Rule 30 Motion along with the Court's order to show cause. *See* Dkt. No. 184. Inexplicably, despite being furnished with the transcript of Plaintiff's deposition, the Judge ruled that "The Court *finds that there is no basis to terminate Plaintiff's deposition and that Defendants may use up* to three hours to ask any remaining questions they have. *See Id.* Appallingly, in that same order of June 19, 2021, (Dkt No. 184), the Magistrate Judge chose not to end the abuse and humiliation of Plaintiff and instead focused on Affiant. Even by his own order, which reads: "Finally, Finkelstein halted Plaintiff's deposition when defense counsel asked questions about Finkelstein's arrest warrant and criminal complaint, which **arguably relate** to the issue of "whether Plaintiff authorized Mr. Finkelstein to commence this action [...]. In particular, Defendants are entitled to answers to any questions they have probing whether Plaintiff authorized Finkelstein to commence this action, including, to the *extent relevant thereto*, *questions surrounding the issues raised by the criminal complaint* (and, more recently, indictment) issued against Finkelstein." *Id.* at 3. The Judge then footnotes "The Court would not look favorably, however, on questions concerning the warrant or indictment that are not relevant to any issue in this action and that instead appear intended to harass counsel." *Id.* This ruling is not only inherently contradictory, but it is also beyond comprehension that the Judge would enable defendants' counsel to pose questions about how a criminal proceeding against Affiant "arguabl[y] relates" to this ADA lawsuit. Why discuss anything that *arguably* relates? To reiterate, Affiant

never stopped or obstructed Mr. Antolini from being asked if he authorized this lawsuit. There are

however other factors that weigh against the sordid line of questioning that the Judge has given

 the green light to: (i) Mr. Antolini is not part of any criminal complaint nor indictment filed against

Affiant or anyone else; (ii) Mr. Antolini has already responded to questions about his authorization

to commence the instant matter over a year ago; (iii) Mr. Antolini, via videoconference, was

questioned, at length, by the Judge, and later on at a telephonic conference just ***a few weeks ago***

(August 4, 2021). The continually contradictory & fluctuating rulings regarding the questioning of

Mr. Antolini are irreconcilable. In this title III Americans with Disabilities Act lawsuit, this Judge has

and is enabling defendants' lawyers to ask questions of my client about issues raised in a criminal

complaint against Affiant… Due process? What an exemplar of gross abuse of judicial power and

the complete disregard of the administration of justice. For whatever the Judge's reasons, other

than his bias and personal animosity against Affiant, what need be made crystal clear *is that*

*affiant never directed Dino Antolini not to answer "whether Plaintiff authorized Finkelstein to*

*commence this action*." Plaintiff's deposition (Dkt No. 167-1 at 271-72) reads as follows:

DEFENSE COUNSEL: Quote, [W]hen defendants take the deposition of plaintiff, they are free to ask questions regarding whether plaintiff authorized Mr. Finkelstein to commence this action and/or regarding plaintiff's interrogatory responses. End quote. So I'm going to continue.
MR. FINKELSTEIN: Well, if you want to ask those -- on the record, Susan?
THE COURT REPORTER: Yes.
MR. FINKELSTEIN***: If he wants to ask those two questions, I have no issue with those at all. Anything else is attorney/client -- actually, that is, too, but I'll allow –***
MR. FINKELSTEIN: Excuse me. You're interrupting me. ***I'll allow that, of course, pursuant to***

***Judge Stewart's [sic] order***."

Any reading of the transcript that does not reflect the words on the page is bogus.

     Further, Judge Aaron's failing logic in allowing any questions related to Affiant makes little to

no sense. Mr. Antolini has absolutely nothing to do with either the criminal complaint or any

indictment. What is crystal clear is that Affiant never directed Plaintiff not to answer, as per the

Court's directives. In his order at Dkt. No. 184, Judge Aaron wrote:

> "Moreover, based on Finkelstein's conduct, the Court will impose sanctions on him. The Court will base the extent and/or amount of such sanctions on the totality of Finkelstein's conduct during Plaintiff's deposition, which remains open. Once the deposition is completed, the Court will issue a written Opinion and Order regarding such sanctions."

To reiterate, this decision came about **even after the Judge was furnished with the deposition transcript** which clearly reflects that 1) no such violations occurred and 2) of the most paramount concern should have been the humiliation and ugliness that was inflicted on Plaintiff. Why a protective order was not issued is unfathomable. Further, the rulings from the Courts' two (2) phone calls during the deposition were that Plaintiff's counsel was to say <u>one, and only one word</u>: "objection," and, to remain "a potted plant." Both directives violated Affiant's right to protect his client from improper questioning and violated Plaintiff's right to have his attorney act as.. his attorney. Even still, both directives were adhered to the extent that no other words needed to be uttered until attorney-client privilege was violated and Plaintiff was harassed. Likewise, any other objections were in conformity with the Federal Rules of Civil Procedure and were articulated concisely and in a nonsuggestive manner, including declining to respond based on attorney-client privileged communications. A reading of the transcript will also reflect that no coaching of Mr. Antolini took place. Affiant had every right to terminate the deposition based upon Rule 30. Up until the time of the deposition was halted Mr. Antolini's deposition proceeded uninterrupted and his testimony was taken properly, subject to Plaintiff counsel's objections. *See* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, <u>Federal Practice and Procedure</u> § 2113, 556 (3d ed. 2010); Nat'l Microsales <u>Corp. v. Chase Manhattan Bank, N.A.</u>, 761 F. Supp. 304, 307 (S.D.N.Y. 1991) (noting the proper procedure for non-privilege objections "is for the attorney who raises the objection to note his objection but to allow the question to be answered."). That is exactly what transpired. Plaintiff's counsel's objections were proper based on the plain reading of both Judge Aaron's order as well as a clear reading of Fed. R. Civ. P 30(c). The blanket statement that there will be sanctions is wholly without merit and not supported by any facts nor case law. *See e.g.*, <u>Sicurelli v. Jeneric/Pentron, Inc</u>., WL 351701 at *7 (E.D.N.Y. Dec. 30, 2005) (declining to impose sanctions where "counsel's interference ..did significantly frustrate the progress of and [examiner]'s ability to complete the depositions" but "counsel's conduct ... was not so completely without merit as to require the conclusion that the conduct was undertaken to harass or delay or for some improper purpose"). In addition, there was never any discussion in the Judge's Order about Rule 26 and the "proportionality" amendments to Rule 26 in December of 2015. Nor was there even any consideration of same. There is, and never has been any rhyme or reason for any of this, except of course that it now mandates that the Judge recuse himself, in order to assure that Plaintiff is treated like a human being where the lack of justice is removed, and the lawsuit may proceed properly and no longer stonewalled.

**13.**        Under 28 U.S.C. § 144, if a judge finds that a movant's affidavit seeking to disqualify him establishes legally sufficient claims of personal bias or prejudice**,** he must proceed no further and allow another judge to be assigned to the proceeding. *See* 28 U.S.C. § 144. The behavior described herein cries out for recusal as there cannot exist a paradigm clearer cut than here.

**14.**         The tortured saga recounted began during Affiant's first appearance before the

Magistrate (telephonically in between Dkt. No.'s 40 & 41) on June 10, 2020 that the attorney-client

relationship between Mr. Antolini and affiant began to be scrutinized by Judge Aaron. During the

conference, Judge Aaron, in a somewhat jovial manner, made reference to all counsel being of

the Jewish faith. That tone went right out the door as soon as the lawyer for the defendants told

the Judge that I was the subject of a criminal complaint pending in the Southern District of New

York. The tenor of the conference immediately became inappropriate, tense, and the personal

investigation of Affiant began. The docket is filled with arbitrary & capricious orders and decisions,

unfounded in law and fact, devoid of any rationale, blatantly aimed squarely against Affiant, but

more importantly, has had the deleterious impact on Mr. Antolini and his case. Further, at the first

conference he ordered interrogatories from my client simply because defendants' lawyer

concocted some story that it was my client who took photos of the violations at the facility, stating

"it appears" that it was Mr. Antolini's SNEAKER, **and a sneaker only,** was depicted in the

photograph made part of the Complaint. The Judge bought into that hook, line and sinker and his

crusade against Plaintiff and affiant began.

     The Judge has systematically, through two very willing defense lawyers, initiated his

investigation of the criminal charges against affiant and the relationship between Mr. Antolini and

I, albeit knowing that Plaintiff was not part of any criminal proceedings involving me. All of this,

while never ever attempting to actually help aid in bringing the subject facility into compliance with

the ADA or bringing the case toward any productive dialogue at all. Strikingly, Mr. Antolini's other

pending cases where I am also his attorney, in this very Courthouse, have been proceeding

without the denial of Affiant's due process rights, along with the attendant presumption of

innocence15* which this Judge has not been concerned with in a blatant exhibit of his dereliction

---

[15] *See e.g.,* Antolini v. N Corporation, 19-cv-07385-KPF at Dkt. No. 47 (S.D.N.Y. 2020) ("Defendants have failed to identify a basis to doubt Plaintiff's counsel's representation, as an officer of the Court, that he has been retained by his client, Dino Antolin[i]. The criminal complaint identified by Defendants' counsel does not pertain to this action. Defendants' counsel's suggestion of a presumption of criminal activity by Plaintiff's counsel, based solely on the fact of the prosecution, does not comport with the presumption of innocence afforded to criminal defendants").

of duty. During every conference subsequent to June 6, 2020, Judge Aaron has shouted at me

with disdain. Affiant contacted the Audio Department at the Courthouse and spoke with Mr.

William Jarrett to obtain the voice recordings of those conferences in order to attach to the instant

Motion. Unfortunately, I was informed by Mr. Jarrett that the audible recordings are not available.

Added to the clear language of **§ 455,** which requires disqualification where the court's impartiality

might reasonably be questioned, is the holding of the Supreme Court in Liteky v. U.S., 510 U.S.

540 (1994) that clearly requires disqualification under the circumstances present here.

**15.**        22 NYCRR §100.3[B][4] provides: "A judge shall perform judicial duties without bias or

prejudice against or in favor of any person.

C. Disqualification: (1) A judge shall disqualify himself or herself in a proceeding in which the

judge's impartiality might reasonably be questioned, including but not limited to instances in

which:(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of

disputed evidentiary facts concerning the proceeding. Title 28 U.S.C. § 455(a) also provides: Any

justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in

which his impartiality might reasonably be questioned. This provision governs circumstances that

constitute an *appearance of partiality*, even though actual partiality has not been shown. *See*

Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988). The determination of

whether such an appearance has been created is an objective one based on what a reasonable

person knowing all the facts would conclude. *See Id.* at 860-61, 108 S.Ct. 2194; see also Liteky

at 554 (noting that Section 455(a) requires an "objective" evaluation of a potentially disqualifying

interest, and that "what matters is not the reality of bias or prejudice **but its appearance**"); Chase

Manhattan Coffee, Inc., 2020 WL 8614089 at *3 (S.D.N.Y. Dec. 9, 2020) (where Judge Schofield

recused herself even *before* an inappropriate situation developed "to protect the public's regard for

the impartiality of the judiciary and avoid *any* appearance of impropriety). The entire record of this

case tells us that the horse left the barn a year ago on the question of "his impartiality might

reasonably be questioned." It is, and has been blatantly on display throughout.

**16.**        **Section 455(a)** contains broader grounds for disqualification than §144 or § 455(b)(1)

and requires a judge to recuse himself in "any proceeding in which his impartiality might

reasonably be questioned." 28 U.S.C. § 455(a); Apple v. Jewish Hosp. & Med. Ctr., 829 F.2d

326, 333 (2d Cir.

1987). Under §144, if a judge finds that a movant's affidavit seeking to disqualify him establishes legally sufficient claims of personal bias or prejudice either against him or in favor of any adverse party, he must proceed no further and allow another judge to be assigned to the proceeding. **28 U.S.C. § 144**. The alleged bias must result from an extra judicial source or the judge's remarks reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. Liteky v. United States, 510 U.S. 540, 554 (1994). In evaluating the supporting declarations, the court must assume that the factual averments are true, even if the judge believes them to be false. US. v. Balistrieri, 779 F2d 1191, 1199, (7th Cir. 1985).

17.        An incredible exchange took place on August 4, 2021 (Transcript at Dkt. No. 208) when the Judge further revealed his animus and hostility to Affiant. At the end of the telephonic conference I again asked the court about lifting the stay on discovery from all defendants. The Judge refused to lift the stay, even though he has previously said that his reason for doing so was waiting for Judge Daniels decision on Plaintiff's default judgment. The Judge was aware of Judge Daniels' decision denying Plaintiff's motion for default so ordered on July 20 (Dkt. No. 198) and its later amendment three days later). Yet, the judge inexplicably maintained that he would not lift the stay! I was absolutely flabbergasted ***when he further told me that I should not have opposed his Report and Recommendation to deny the motion.*** I asked him why should not have done that, to which there was no response given. The judge began shouting at me and when I asked him why, he gaslighted the situation and said I was the one doing the shouting. *See* U.S. v. Amico, 486 F.3d 764 (2d Cir. 2007) (where 2nd Circuit vacated district court judge's refusal to recusal himself after court found that "[a] disinterested observer would have discerned on occasion a defensive or perhaps even hostile approach by the judge […], calling them, for example, "upsetting and offending.""). When I said on the record that I would get the recording of the conversation he immediately stopped the shouting. As the Judge's chambers is aware, your affiant promptly tried to obtain the audio recording but was told that because a court reporter was present, the conference would not have been recorded.

However, Mr. Antolini was on the call and was a witness to the conduct exhibited.

**Canon 3A:** Judges Should Perform the Duties of the Office Fairly, Impartially and Diligently:

The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased.

**Canon 2A.** An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is Impaired.

18.        Judge Aaron's open hostility to the Plaintiff and his counsel is manifest, and it necessitates and mandates that he recuse himself in order to assure that Mr. Antolini is treated fairly and impartially. Judge Aaron has sufficiently revealed such a level of personal animus towards Plaintiff and Affiant as to make it inappropriate for him to continue as the judge in this case. He has demonstrably and repeatedly shown that he makes fair judgment impossible which begs the question, why would he want to continue to preside over this case.

I declare under penalties of perjury that the foregoing is true and correct.


Executed on August 24th, 2021
Syosset, New York


_____/S_____
Stuart H. Finkelstein, Esq.
Attorney for Plaintiff
338 Jericho Turnpike
Syosset, New York 11791
(718) 261-4900