**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  11/19/2021
```

Dino Antolini,

                               Plaintiff,

               -against-

Amy McCloskey, et al.,

                            Defendants.

**1:19-cv-09038 (GBD) (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

        This Opinion and Order addresses the parties' cross-requests for sanctions arising out of the deposition of Plaintiff Dino Antolini ("Plaintiff" or "Antolini"). As discussed further below, Plaintiff's motion for sanctions is DENIED, and Defendants' request for sanctions is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

        I have set forth much of the lengthy and tortured factual and procedural history of this case in prior decisions—most recently, in my Opinion and Order denying Plaintiff's motion for recusal, *Antolini v. McCloskey*, No. 19-CV-09038 (GBD) (SDA), 2021 WL 4596522 (S.D.N.Y. Oct. 6, 2021) (ECF No. 247)—familiarity with which is assumed. Below, I recite the facts necessary for an understanding of the issues presently before me.

**I.**    **Plaintiff Files Suit; Plaintiff's Counsel Is Arrested**

        Plaintiff, by and through his attorney of record, Stuart H. Finkelstein ("Finkelstein"), commenced this action on September 28, 2019, asserting claims under the Americans with Disabilities Act (the "ADA"), *inter alia*. (*See* Compl., ECF No. 1.) Plaintiff, a wheelchair user, alleges

that Defendants failed to make their place of public accommodation, a cocktail bar named Madame X, accessible to persons with disabilities. (*Id*. ¶¶ 2, 6.)

On or about November 19, 2019, Finkelstein was arrested based upon a criminal complaint issued by the U.S. Attorney's Office for the Southern District of New York (the "Criminal Complaint"). (*See* Compl., *U.S. v. Finkelstein*, No. 21-CR-00217, ECF No. 1.) Among other things, the Criminal Complaint charged Finkelstein with using the stolen identity of two individuals to file hundreds of fraudulent lawsuits pursuant to the ADA that those individuals never authorized. (*See id*. ¶¶ 8-9.)[1]

On August 4, 2020, after District Judge Daniels referred this case to me for General Pretrial (*see* Order of Ref., ECF No. 36), Defendants filed an Emergency Letter Motion "requesting a framed-issue hearing for the examination of Plaintiff, under oath, on the subject of whether Plaintiff knowingly authorized [Finkelstein] to commence the instant action."[2] (Defs.' 8/4/20 Ltr. Mot., ECF No. 60.) In opposition, Finkelstein denied the existence of any "emergency" and opined that, were Defendants' concerns sincere, their appropriate course of action was to take Plaintiff's

---

[1] In March 2021, an indictment against Finkelstein was issued by a Grand Jury. (*See* Finkelstein Indictment, 21-CR-00217, ECF No. 35.) Criminal proceedings remain pending against Finkelstein in this Court.

Previously, Finkelstein was disbarred in 2006 in connection with "an investigation by the Grievance Committee for the Second and Eleventh Judicial Districts into allegations that he, *inter alia*, submitted false and misleading answers and documents to the Grievance Committee that were altered in connection with two pending complaints of professional misconduct." *See In re Finkelstein*, 39 A.D.3d 120, 121 (2d Dep't 2007). He was reinstated in 2016. *See In re Finkelstein*, 137 A.D.3d 1028, 1028 (2d Dep't 2016).

[2] Defendants earlier had raised this subject, and related concerns, in a letter to Judge Daniels dated May 4, 2020 (Defs.' 5/4/20 Ltr., ECF No. 32, at 2-3), and again in a June 10, 2020 hearing before me. (6/10/20 Tr., ECF No. 45, at 11-12, 17-18; *see also id*. at 5-6, 8-11.) Defendants attached to their Emergency Motion an Affidavit of Brad Hamilton, who had helped Defendant Amy McCloskey open Madame X in 1997 (*see* Hamilton Aff., ECF No. 60-5, ¶ 1), and who attested that on November 23, 2019, Plaintiff stated that he had never been to Madame X, that he had stopped drinking alcohol approximately two years before his alleged visit to Madame X, that he never agreed to serve as the sole plaintiff in any lawsuit, and that he "felt he had been 'scammed' by his attorney." (*See id*. ¶¶ 4, 12-15.)

2

deposition. (Pl.'s 8/5/20 Ltr., ECF No. 61, at 2.) Finkelstein's opposition also stated that "[t]he

most powerful U.S. Attorney's Office in the country *subpoenaed and spoke directly [with Plaintiff]*

*and rightfully, nothing came of it*." (Pl.'s 8/5/20 Ltr. at 2 (emphases in original).)[3]

On August 7, 2020, the Court denied the Emergency Letter Motion, stating: "When

Defendants take the deposition of Plaintiff, they are free to ask questions regarding whether

Plaintiff authorized Mr. Finkelstein to commence this action[.]" (8/7/20 Order, ECF No. 63, ¶ 1.)

## II.  Plaintiff Is Compelled To Sit For His Deposition

When Judge Daniels referred this case to me in June 2020, all depositions were scheduled

to be complete by December 2, 2020. (*See* 5/5/20 Order, ECF No. 33.) By cover email dated

September 18, 2020, Defendants noticed Plaintiff's deposition for October 28, 2020. (*See* Defs.'

10/26/20 Mot. to Compel, Ex. D, ECF No. 105-4, at 3.) Over the following months, Plaintiff twice

unilaterally declined to appear for his live deposition, requiring Defendants to seek an extension

of discovery and, ultimately, to move to compel Plaintiff to sit for his deposition.[4]

After Finkelstein, in response to Defendants' motion to compel, advised the Court that he

had proposed to Defendants that Plaintiff's deposition take place by written questions because

Plaintiff was "unable to verbally participate" in a live deposition (*see* Pl.'s 2/16/21 Ltr., ECF No.

---

[3] Several months later, Finkelstein admitted that this statement was false. (*See* Pl.'s 11/23/20 Ltr., ECF No. 116 ("I have now come to learn that the US Attorney's Office did not speak with [Plaintiff].").)

[4] (*See* Defs.' 10/26/20 Mot. to Compel, Ex. D, at 2 (Finkelstein informing Defendants, in a one-sentence email one week prior to deposition's notice date, "We will be unable to attend."); Defs.' 12/1/20 Ltr. Mot., ECF No. 121 (Defendants requesting ninety-day extension of deposition deadline); Defs.' 2/10/21 Ltr. Mot. to Compel, Ex. B, ECF No. 140-2, at 6 (referencing Plaintiff's deposition noticed for February 11, 2021); Pl.'s 2/16/21 Ltr., ECF No. 141, at 1 (stating that, one week prior to deposition's notice date, Finkelstein informed Defendants that Plaintiff was "unable to verbally participate in his deposition"); Defs.' 2/10/21 Ltr. Mot. to Compel, at 1 (asserting that "Plaintiff has repeatedly failed to confirm his attendance for two (2) duly-noticed depositions, and has generally refused to provide his availability to sit for a deposition" and moving to compel Plaintiff to "appear for a deposition, at a date and time scheduled by the Court").)

141, at 1), the Court scheduled a video hearing for March 2, 2021 and directed Plaintiff himself

to appear. (*See* 2/17/21 Order, ECF No. 142, ¶ 2.) At that hearing, after making inquiries of

Plaintiff to determine whether he could participate in a remote live deposition notwithstanding

his medical condition, the Court concluded that, while Plaintiff "does have, in fact, difficulty

communicating . . . , the Court is satisfied that Mr. Antolini, under oath, can answer questions

that are properly posed to him" at a live deposition. (3/2/21 Tr., ECF No. 195 at 23.) In an Order

following the conference, the Court granted Defendants' motion to compel and ordered that

Plaintiff's remote live deposition commence on April 19, 2021. (3/2/21 Order, ECF No. 150, ¶¶ 1,

2.) In the same Order, the Court directed that "there shall be no objections at Plaintiff's

deposition other than objections to form and objections on the basis of privilege, and only in the

case of the latter may Plaintiff decline to answer the question posed."[5] (*Id*. ¶ 3; *see also* 3/2/21

Tr. at 12, 22-23.)

## III.    **Plaintiff's April 19, 2021 Deposition**

Plaintiff's deposition commenced on April 19, 2021, with Defendants' counsel, Jason

Mizrahi ("Mizrahi") asking the questions. (*See* 4/19/21 Dep. Tr., ECF No. 167-1.) Within the first

hour of the deposition, Mizrahi called the Court's chambers twice to complain of Finkelstein's

"improper speaking objections[,] . . . repeated instructions and coaching."[6] (*Id*. at 36-38, 48.) On

---

[5] The Court previously had given a similar directive in connection with Defendants' depositions during a call received from the parties in the midst of Defendants' depositions. (*See* 3/2/21 Tr. at 22-23.)

[6] For example, after Antolini was asked, "[A]re you taking any other prescription medications?" and he responded, "No," Finkelstein stated, "We need you to -- objection to form. We need you to clarify the question." (Antolini Dep. Tr. at 22.) Finkelstein then asked Antolini if he understood Mizrahi's question to which Antolini responded, "I don't understand." (*Id*. at 23.) Later, after Antolini was asked, "[H]ave you taken any substances in the last 24 hours that would affect your ability to testify accurately or to understand my questions?," and he responded, "No," Finkelstein asked, "What do you mean by substances? . . . Do you know what he means?" (*Id*. at 24-25.) These questions by Finkelstein then led

the first call, the Court reiterated to Finkelstein its instructions in its March 2 Order: "I'm going to be crystal clear. You may object to the form of a question or object—state any objection you want to any question with the word [']objection.['] You are not permitted to instruct the witness not to answer except on privilege grounds or give any other instructions or speak any other words than the word [']objection.[']" (*Id*. at 40.) On the second call, the Court stressed repeatedly that there would be "financial consequences" for further violations of those instructions:

> I'm going to get a copy of this transcript in the event that the speaking objections continue, and I will impose sanctions for each and every speaking objection you make, Mr. Finkelstein.
>
> I haven't figured out what the -- what the number is, what the dollar figure is, but it will be significant.
>
> So if you choose to continue behaving in this manner in violation of my ruling, there will be financial consequences associated with it.

*Id*. at 51-52.

Finkelstein continued to make improper speaking objections, certain of which appear to have been designed to coach Plaintiff.[7] Even where his objections were not speaking objections, they were often disruptive; his objections interrupted Mizrahi's questions to the point that the Court Reporter had to ask Finkelstein to stop: "Hang on. Can I just ask, Mr. Finkelstein, can you

---

Antolini to state, "I don't know what he means by that." (*Id*. at 25.) Finkelstein also instructed Antolini not to answer the question, "What other lawsuits were you involved in?" (*Id*. at 33.)

[7] (*See, e.g.*, 4/19/21 Dep. Tr. at 119-20 ("Q. . . . [C]an you tell me the last time you traveled to Manhattan? MR. FINKELSTEIN: I believe he said he was there yesterday. A. Yeah."); *id*. at 131 ("Q. Health permitting, do you have any future plans to go to West Houston Street? MR. FINKELSTEIN: Objection. Asked and answered. A. I think I answered already."); *id*. at 178-79 ("Q. Mr. Antolini, are you familiar with the business at 228 Thompson Street in -- MR. FINKELSTEIN: Objection. Q. --New York, New York -- MR. FINKELSTEIN: Asked and answered. Q. -- 10012? MR. FINKELSTEIN: Asked and answered about seven, eight minutes ago. Objection. Q. Mr. Antolini? A. You asked me that seven times already."); *id*. at 247 ("Q. Mr. Antolini, it says here, quote, your memory is worsening. You're having trouble with concentration. You were to repeat a brain MRI, and you were referred to obtain labs for reversible dementia that you did not complete. MR. FINKELSTEIN: Objection. Whatever that means. I'm not sure. . . . A. I have no idea.").)

just let him get the whole question out? Because the address is getting choppy when you're objecting in the middle of the question." (4/19/21 Dep. Tr. at 181; *see also, e.g.*, *id*. at 103, 111.)

Approximately five hours into the deposition, Mizrahi sought to ask Antolini questions about Finkelstein. (*See* 4/19/21 Dep. Tr. at 272-82.) Finkelstein did not allow it. He instructed Antolini not to answer a question as to how they had met, did not permit Antolini to answer questions regarding a deposition exhibit consisting of copies of his arrest warrant and Criminal Complaint, and, ultimately, in response to a question as to whether Antolini was aware that he had been arrested, unilaterally terminated the deposition.[8]

## IV.    The Court Issues And Rules On An Order To Show Cause

On May 6, 2021, after reviewing the transcript of Plaintiff's April 19 terminated deposition, the Court ordered that Finkelstein show cause why he should not be sanctioned, pursuant to Rules 16(f) and 37(b)(2) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and/or the inherent powers of the Court, for his violations of the Court's March 2 Order and of the Court's rulings made during the deposition. (5/6/21 Order to Show Cause ("OTSC"), ECF No. 169.) On June 7, 2021, Plaintiff moved to terminate his deposition and for sanctions against Mizrahi for his deposition conduct. (Pl.'s 6/7/21 Mem., ECF No. 177.) Then, on June 11, 2021, Finkelstein responded to the OTSC. (Finkelstein's 6/11/21 Mem., ECF No. 180.) Defendants

---

[8] (*See* 4/19/21 Dep. Tr. at 272 ("Q. How did you and Mr. Finkelstein meet? MR. FINKELSTEIN: Don't answer. Next question. Directing him not to answer."); *id*. at 273 ("MR. MIZRAHI: Madam Court Reporter, I'm going to be admitting this [arrest warrant and Criminal Complaint] into evidence. MR. FINKELSTEIN: No, you're not. If you don't get it off the screen, and we're not talking about that either, this -- this deposition will be over. It will be cancelled. It will be terminated."); *id*. at 274 ("MR. FINKELSTEIN: . . . . [Mizrahi] mentioned something about an arrest just now. Mr. Antolini is not going to respond to it, I'm not going to respond to it, and we'll let the chips fall where they may with Judge Aaron Stewart [*sic*] . . . ."); *id*. at 281-82 ("Q. Mr. Antolini, were you aware that Mr. Finkelstein was arrested? MR. FINKELSTEIN: Okay, that's it. Dino, hop off -- hop off the deposition. Hop off. Turn it off. We're done. We're done.").)

responded to Plaintiff's and Finkelstein's submissions on June 9, 2021 and June 18, 2021, respectively. (Defs.' 6/9/21 Ltr., ECF No. 178; Defs.' 6/18/21 Mem., ECF No. 182.)

In an Order, dated June 19, 2021, the Court concluded that it was "clear that Finkelstein violated the Court's March 2, 2021 Order, as well as the Court's rulings made during Plaintiff's deposition," and indicated that it would impose sanctions on Finkelstein. (6/19/21 Order, ECF No. 184, at 2 (citation omitted).) The Court deferred the determination and imposition of those sanctions, stating that it would "base the extent and/or amount of such sanctions on the totality of Finkelstein's conduct during Plaintiff's deposition, which remains open." (*Id*.) The Court denied Plaintiff's motion to terminate the deposition, and denied without prejudice Plaintiff's motion to sanction Mizrahi for the purportedly harassing nature of his deposition questions, stating that, "[a]fter Plaintiff's deposition has been completed, Finkelstein may file a motion for sanctions based on defense counsel's conduct at the entire deposition." (*Id*. at 3, 4.) The Court ordered that Plaintiff's deposition be concluded no later than July 23, 2021. (*See id*. at 5.)

## V.   Plaintiff Fails To Appear For His Court-Ordered Deposition And Related Conference

On June 25, 2021, Defendants noticed Plaintiff's continued deposition by means of video teleconferencing for Friday, July 9, 2021. (*See* Defs.' 7/6/21 Mot. to Compel, Ex. A, ECF No. 190-1.) Two days prior to the noticed deposition date, Plaintiff advised that he was unavailable on that day, but that he was available on July 23, 2021. (Pl.'s 7/7/21 Ltr., ECF No. 192.) On July 13, 2021, the Court directed that Plaintiff's continued deposition go forward on July 23, 2021 at 10:00 a.m. (7/13/21 Memo Endorsement, ECF No. 197.)

In an Opinion and Order, dated July 20, 2021, concerning a separate discovery issue in this case, District Judge Daniels cautioned Finkelstein as follows: "[T]his Court is aware of Mr.

Finkelstein's dilatory conduct during discovery and that Magistrate Judge Aaron has previously imposed sanctions on Mr. Finkelstein based on his conduct at his client's deposition. Thus, Mr. Finkelstein is warned that the continuance of such behavior will result in all appropriate sanctions." *Antolini v. McCloskey*, No. 19-CV-09038 (GBD) (SDA), 2021 WL 3076698, at *3 (S.D.N.Y. July 20, 2021) (ECF No. 198) (citation omitted).

Two days later, on July 22, 2021, Finkelstein filed a letter indicating that Plaintiff could not go forward with his deposition the following morning, because he would be accompanying his wife to an appointment at Bellevue Hospital instead, and because Plaintiff's grandson, whose technical assistance was required in order for Plaintiff to participate in a deposition via videoconference, was in Italy. (Pl.'s 7/22/21 Ltr., ECF No. 200.) The letter stated that Plaintiff could be available by telephone "late in the afternoon" on July 23. (*See id*.)

The Court then scheduled a telephone conference for 3:00 p.m. on July 23, 2021. (7/22/21 Order #2, ECF No. 204.) The Court's Order provided that "Plaintiff shall participate." (*Id*.) Plaintiff failed to appear for that conference. (*See* 7/23/21 Tr. at 5.) The Court then entered an Order directing Plaintiff to appear for a telephone conference on August 4, 2021, and directing Defendants' counsel to submit proof of the costs and fees incurred in connection with preparation for the cancelled deposition. (7/23/21 Order, ECF No. 205.) On July 27, 2021, Defendants' counsel filed a letter enclosing its corresponding time records. (Defs.' 7/27/21 Ltr., ECF No. 207.) Plaintiff appeared at the August 4 telephone conference, where he candidly admitted he was "aware [that he was] supposed to be at a [court-ordered] deposition [on July 23, 2021], and [he] chose to go with [his] wife to Bellevue [Hospital] instead." (*See* 8/4/21 Tr., ECF No. 215, at 8-9.)

Subsequent to that conference, the Court directed that Plaintiff's continued deposition proceed via video on Thursday, August 26, 2021. (8/12/21 Memo Endorsement, ECF No. 216.)

## VI.   Plaintiff's August 26, 2021 Continued Deposition

Plaintiff's continued deposition commenced on August 26, 2021, with Mizrahi again asking the questions. (*See* 8/26/21 Dep. Tr., ECF No. 232.) Remarkably, notwithstanding the intervening rulings and warnings from both District Judge Daniels and from me, Finkelstein's conduct at the continued deposition was even more disruptive and contumacious than it had been at the April 19 deposition.

Finkelstein continued to make improper speaking objections, at a higher frequency than during the April deposition,[9] including speaking objections that appear to have been designed to coach Plaintiff.[10] He continued to interrupt Mizrahi's questions and otherwise disrupt Mizrahi's

---

[9] For example, the following exchange occurred when Mizrahi asked his first substantive question of the continuation:

> Q. Mr. Antolini, besides this lawsuit, have you ever been involved in any other legal claims or lawsuits?
>
> A. Yes—
>
> MR. FINKELSTEIN: Objection. Objection. Asked and answered at the last deposition at length, ad nauseam. And if you're going to continue to repeat the same questions that you did last time, we're going to need to call up the Judge to get a ruling. This is a continuing deposition, it's not a rehash of the last four hours that we had April 19th. So I'll be guided by your next question, Counsel.

(8/26/21 Dep. Tr. at 10; *see also, e.g., id.* at 13, 18, 26, 28, 29, 46, 47, 51, 52, 53, 54, 55-56, 59, 60, 61, 62, 64, 65, 79, 93, 95-96, 104, 105-06, 108.)

[10] For example, the following exchange occurred when Mizrahi asked about Plaintiff's reasons for naming three individual Defendants in this lawsuit:

> Q. Mr. Antolini, the three individuals that I listed appear to be named as individual Defendants in this lawsuit. Why are they named in this lawsuit?
>
> MR. FINKELSTEIN: Objection. I don't know. Why are they named in this lawsuit? Dino, if you know, you know. If you don't, you don't. It's okay, when I think about it.
>
> THE WITNESS: I don't know.

chosen course of progressing through the deposition, again leading the Court Reporter to request a reduction in cross-talk—ironically enough, only to be cut off by Finkelstein as he did so:

> THE REPORTER: It's really difficult for me to get this down with all the—
>
> MR. FINKELSTEIN: Yeah. I'm glad you said that. Next question, please. Thank you.

(8/26/21 Dep. Tr. at 79; *see also id*. at 71 ("[T]here's just lots of crosstalk, so it makes it very difficult.").) On several occasions, such disruptive interjections involved *ad hominem* comments insulting and/or mocking Mizrahi.[11]

Most egregiously, on at least 60 occasions by the Court's count, Finkelstein instructed Plaintiff not to answer a question from Mizrahi.[12] While some of those occasions involved Finkelstein asserting an ostensible claim as to attorney-client privilege, the majority of those

---

(8/26/21 Dep. Tr. at 95; *see also, e.g.*, *id*. at 14, 21, 45-46, 57.)

[11] For example, Finkelstein insulted both Mizrahi's lawyering and his appearance after Mizrahi asked Plaintiff whether he trusted Finkelstein:

> Q. Mr. Antolini, do you trust Mr. Finkelstein?
>
> MR. FINKELSTEIN: Don't answer that.
>
> THE WITNESS: Yes.
>
> MR. FINKELSTEIN: Oh, yes. Okay, Dino. I appreciate that. Next idiotic question, please, already. Oh, my God. Hey, Jonathan, let me ask you a question. How come you keep going on mute, and I can't see your smiling face; what's up with that?
>
> THE REPORTER: It's just standard. I try not to be a distraction.
>
> MR. FINKELSTEIN: You'd be a welcome distraction. If you want to put your face up there, that would be nice. Otherwise, I gotta look at -- you know what I mean?

(8/26/21 Dep. Tr. at 37; *see also, e.g.*, *id*. at 6-7, 9, 42, 65, 110.)

[12] (*See, e.g.*, 8/26/21 Dep. Tr. at 15-16, 31-32, 34, 35, 37, 38, 39, 41, 43, 43, 44, 48-49, 49, 49-50, 57, 57-58, 66, 70-71, 74-75, 76, 78, 79, 80, 84, 85, 86, 87, 88, 89, 90, 91, 92-93, 93, 93-94, 98, 99, 100, 101, 102, 109, 110.)

occasions did not.[13] In any event, as further discussed below, in several of the instances in which he did claim privilege, the claim appears to have been baseless.[14]

### VII.    **The Parties Seek Sanctions**

On August 26, 2021, having been advised that Plaintiff's deposition was complete, the Court entered an Order setting forth, *inter alia*, a briefing schedule for any motions for sanctions arising from the deposition (Order, ECF No. 220).

On September 14, 2021, Defendants filed a memorandum in support of their request for sanctions against Finkelstein, under Rules 16(f) and 37(b)(2) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and/or the inherent powers of the Court. (Defs' Mem., ECF No. 235 (incorporating by reference Defendants' prior sanctions brief dated June 18, 2021 (ECF No. 182)).) On October 4, 2021, Plaintiff filed an opposition (Pl.'s Opp., ECF No. 244), and on October 18, 2021, Defendants filed a reply (Defs.' Reply, ECF No. 249).

On September 29, 2021, Plaintiff moved for sanctions against Mizrahi under Rules 11(b), 16(f), 30(d) and 37(b) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and the inherent powers of the Court. (*See* Pl.'s Mem., ECF No. 242-1.) On October 15, 2021, Defendants filed an

---

[13] (*See, e.g.*, 8/26/21 Dep. Tr. at 31-35 (in response to questions concerning the Criminal Complaint); *id.* at 37-39 (to questions regarding whether Plaintiff trusts Finkelstein); *id.* at 48-49; 57, 58, 66, 70-71, 76, 76, 80, 84, 85 (to questions concerning Plaintiff's review, verification, execution, and confidence in the accuracy of various case documents); *id.* at 86-89 (to questions concerning Plaintiff's motion for recusal); *id.* at 90-91 (to questions concerning Plaintiff's signature); *id.* at 92-94 (to questions concerning Plaintiff's Complaint); *id.* at 98-101 (to questions concerning Plaintiff's history of alcoholism); *id.* at 102 (questions concerning Plaintiff's claim to have suffered emotional distress); *id.* at 109-10 (to questions concerning Plaintiff's upset state).)

[14] (*See, e.g.*, 8/26/21 Dep. Tr. at 15-17 (in response to questions concerning how Plaintiff met Finkelstein); 41-42 (to questions concerning whether Plaintiff has entered into a Power of Attorney or a retainer agreement with Finkelstein); *id*. at 42-45 (to questions concerning the methods and frequency of Plaintiff's communications with Finkelstein); *id*. at 74-79 (to questions concerning whether Plaintiff signed certain documents in front of Finkelstein).)

opposition (Defs.' Opp., ECF No. 248), and on November 1, 2021, Plaintiff filed a reply (Pl.'s Reply,

ECF No. 250).

**LEGAL STANDARDS**

I.      **Deposition Objections Under Rule 30(c)**

Rule 30(c)(2) of the Federal Rules of Civil Procedure provides:

> An objection at the time of the examination—whether to evidence, to a party's
> conduct, to the officer's qualifications, to the manner of taking the deposition, or
> to any other aspect of the deposition—must be noted on the record, but the
> examination still proceeds; the testimony is taken subject to any objection. An
> objection must be stated concisely in a nonargumentative and nonsuggestive
> manner. A person may instruct a deponent not to answer only when necessary to
> preserve a privilege, to enforce a limitation ordered by the court, or to present a
> motion under Rule 30(d)(3).

Fed. R. Civ. P. 30(c)(2).[15] In order to avoid the use of speaking objections, courts have instructed

counsel to object to a deposition question not calling for privileged information using the single

word, "objection," at most a short phrase. *See Syntel Sterling Best Shores Mauritius Ltd. v.*

*TriZetto Grp.*, 328 F.R.D. 100, 110 (S.D.N.Y. 2018) ("[C]ounsel . . . shall refrain from making

speaking objections when defending depositions. . . . Objections as to the form of the question

shall be made by opposing counsel, who shall simply state, 'Objection.' The objecting counsel

shall not speak any additional words concerning the basis of the objection unless a clarification

is requested."); *Greer v. Mehiel*, No. 15-CV-06119 (AJN) (JLC), 2017 WL 543453, at *3 (S.D.N.Y.

Feb. 10, 2017) ("Objections as to the form of the question shall be made by opposing counsel

. . . , who shall simply state, 'Objection.' The objecting counsel . . . shall not speak any additional

---

[15] Rule 30(d)(3) provides in relevant part: "At any time during a deposition, the deponent or a party may
move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that
unreasonably annoys, embarrasses, or oppresses the deponent or party." Fed. R. Civ. P. 30(d)(3)(A).

words concerning the basis of the objection unless a clarification is requested."); *see also*

*RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc*., No. 18-CV-06037 (DGK), 2019 WL

3291570, at *3 (W.D. Mo. July 22, 2019) ("The parties shall henceforth state the bases for their

objections with only a single word or, if necessary, a short phrase (*e.g*., 'compound question').");

*Severstal Wheeling Inc. v. WPN Corp*., No. 10-CV-00954 (LTS) (GWG), 2012 WL 1982132, at *1

(S.D.N.Y. May 30, 2012) ("To ensure a fair deposition, it is best if counsel state objections to a

question in a single word or phrase.").

## II.      Motions To Terminate Or Limit A Deposition Under Rule 30(d)

Rule 30 of the Federal Rules of Civil Procedure, which governs the taking of deposition,

does not contain provisions for the imposition of sanctions based upon an examiner asking

improper questions. Rather, Rule 30 provides that, "[a]t any time during a deposition, the

deponent or a party may move to terminate or limit it on the ground that it is being conducted

in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent

or party." Fed. R. Civ. P. 30(d)(3)(A).[16] Asking "irrelevant deposition questions does not, by itself,

constitute sufficient annoyance or oppressive conduct contemplated by Federal Rule of Civil

Procedure 30, which allows for the termination or limitation of an examination upon a showing

that the deposition is being conducted in a manner evidencing bad faith, or to embarrass, annoy,

or oppress the deponent." *Berry v. Yosemite Cmty. Coll. Dist*., No. 16-CV-00411 (LJO) (EPG), 2019

---

[16] *See also* 7 Moore's Federal Practice - Civil § 30.51 (2021) ("Rule 30(d)(3) provides that if a deposition is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the deponent or a party, the deponent or a party may move for a protective order. On demand of the objecting party or the deponent, the officer conducting the deposition must suspend the deposition for the time necessary to make the motion.").

WL 2869068, at *12 (E.D. Cal. July 3, 2019), *report and recommendation adopted as modified*, 2019 WL 3943890 (E.D. Cal. Aug. 21, 2019).

**III.    Sanctions Under Rule 30(d) For Dilatory Deposition Conduct**

Rule 30(d)(2) authorizes the Court to sanction any person who "impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). "A court . . . may impose sanctions under Rule 30(d)(2) on its own accord to deter ongoing and future misconduct. 7 Moore's Federal Practice - Civil § 30.43 (2021) (citing *Sec. Nat'l Bank v. Jones Day*, 800 F.3d 936, 942 (8th Cir. 2015) ("Both the purpose and the plain language of Rule 30(d)(2) allow courts to consider sanctions *sua sponte*")). "To impose sanctions [under Rule 30(d)(2)], a Court need not find that a party acted in bad faith." *Cordero v. City of New York*, No. 15-CV-03436 (JBW) (CLP), 2017 WL 2116699, at *5 (E.D.N.Y. May 12, 2017) (citation omitted). "Rather, the only requirement for sanctions is that the fair examination of the deponent was frustrated, impeded, or delayed." *Id*. (citation omitted). "The decision to impose sanctions is at the discretion of the court." *Id*. (citation omitted).

**IV.    Sanctions Under Rule 37(b) For Failure To Obey A Discovery Order**

Where a party's misconduct violates a court order, Rule 37(b) of the Federal Rules of Civil Procedure allows a court to impose on that party sanctions of varying degrees of severity. *Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014). Sanctions may include attorney's fees, adverse inferences, preclusion of evidence, striking pleadings, and default judgment. *See* Fed. R. Civ. P. 37(b)(2)(A). "Instead of or in addition to the orders [referred to] above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable

expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

"[M]onetary sanctions pursuant to Rule 37 for noncompliance with discovery orders usually are committed to the discretion of the magistrate [judge]." *Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*, No. 15-CV-03533 (CM) (BCM), 2017 WL 2840279, at *9 (S.D.N.Y. June 27, 2017) (citing *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990)).

**V.    Sanctions Under Rule 37(d) For Failure To Attend A Deposition**

Rule 37(d) provides that a court has the power to order sanctions when "a party . . . fails, after being served with proper notice, to appear for [his] deposition." Fed. R. Civ. P. 37(d)(1)(A)(i). Pursuant to this Rule, a court may award a variety of sanctions but "must" require the recalcitrant party or its attorney or both "to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3). "It is well-established . . . that a party applying for sanctions under Rule 37(d) is not required to prove that the party who failed to attend the deposition acted in bad faith." *John Wiley & Sons, Inc. v. Book Dog Books*, LLC, 298 F.R.D. 145, 149 (S.D.N.Y. 2014) (citations omitted).

**VI.    Sanctions Under 28 U.S.C. § 1927 And The Court's Inherent Powers**

Under 28 U.S.C. § 1927 ("Section 1927"), sanctions may be imposed on any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. The Court also has inherent power to sanction an attorney, "a power born of the practical necessity that courts be able 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Revson v. Cinque & Cinque,* 221 F.3d 71, 78 (2d Cir. 2000) (quoting

*Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991)). The imposition of sanctions under Section 1927 or the Court's inherent powers requires a finding of bad faith. *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir. 1986). Such sanctions are proper "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id*. Under Section 1927 and their inherent power, courts have imposed deposition costs on attorneys "whose disruptions of a deposition rendered it futile and ineffective, and were obnoxious to the orderly, reasonable, and proper conduct of an examination." *Unique Concepts, Inc. v. Brown,* 115 F.R.D. 292, 293-94 (S.D.N.Y. 1987) (citation and internal quotations omitted).

**APPLICATION**

I.     **Mizrahi's Deposition Conduct Does Not Warrant Sanctions**

Because the issue of the propriety of Mizrahi's deposition conduct is relevant to both of the sanctions motions presently before the Court—given that Plaintiff raises the issue not only as a basis for its own motion, but also as a defense against Defendants' motion—the Court addresses this question first. Plaintiff and Finkelstein characterize Mizrahi's deposition behavior as "abusive, sordid, and atrocious," and as "conducted in bad faith, and in such manner as unreasonably to humiliate, embarrass, abuse and oppress [Plaintiff]." (Pl.'s Mem. at 4, 5; Pl.'s Opp. at 5.) After closely reviewing both deposition transcripts, the Court disagrees.

Plaintiff summarizes his complaint with Mizrahi's deposition conduct as follows:

Defendants' [sanctionable] conduct boils down to 1) humiliating and bad faith questioning about Plaintiff's personal life . . . ; 2) humiliating and bad faith questions about Plaintiff's struggle with alcoholism; 3) humiliating and bad faith questions about Plaintiff's ability/desire to read and write; 4) harassing and bad faith questions about Plaintiff's privileged relationship with his attorney . . . , as well as questions about Plaintiff's counsel's private life; 5) attempted obstruction

16

of Plaintiff's pausing of the deposition to take breaks; and 6) badgering and abusive questioning in the form of mischaracterizing answers and re-asking questions that had been asked upward of seven times.

(Pl.'s Mem. at 5-6.) The Court finds each of the first four items of Plaintiff's list to be within the scope of good-faith, reasonable and proportional discovery in this action, and disagrees with Plaintiff's characterization of the latter two items.

As a preliminary, overarching observation, the Court finds that, in seeking sanctions against Mizrahi and in resisting Defendants' motion for sanctions, Plaintiff and Finkelstein act as if Finkelstein had never been indicted for filing hundreds of fraudulent ADA lawsuits, as if Plaintiff's medical records did not indicate that he has a condition involving impaired memory, and as if there were no sworn testimony in the record attesting to Plaintiff having stated that he never attempted to visit Madame X. But Finkelstein was, the medical records do, and there is such testimony. (*See, e.g.*, Finkelstein Indictment ¶¶ 1, 2; 5/4/21 Tr. at 222-67; Hamilton Aff. ¶¶ 4, 13.) Given these circumstances, the Court finds Defendants within their rights to use discovery to probe the bona fides of Plaintiff's relationships with (1) Finkelstein, (2) the prosecution of this lawsuit, and (3) Madame X.

Thus, while Plaintiff takes issue with Mizrahi questioning him about the "personal" matters of his cell phone information and his sources of income, the Court finds Defendants within their rights to probe, *e.g.*, whether Plaintiff had sufficient income to support his claimed habit of eating out "[o]ne hundred to a thousand" times in a year. (4/19/21 Dep. Tr. at 93.) While it is less clear to the Court exactly how Defendants would use cell phone information to investigate Plaintiff's "travel habits and proximity to [Madame X]," as Defendants claim (Defs.' Opp. at 21), the Court notes that Mizrahi did segue directly from this line of questioning into a

line of questions about Plaintiff's preferred means of local travel. (*See* 4/19/21 Dep. Tr. at 81-83.) In any event, at a minimum, after closely reviewing the deposition passage at issue, the Court finds nothing about the cell-phone line of questioning to suggest "bad faith" or any intention or effect of "abusing," "humiliating," or "oppressing" Plaintiff—and, indeed, in real time, Plaintiff never indicated that this line of questioning bothered him. (*See* 4/19/21 Dep. Tr. at 72-80.)

Likewise, Plaintiff's struggle with alcoholism is plainly within the scope of discovery here, where, *e.g.*, Plaintiff's medical records indicate that Plaintiff's doctor advised him against drinking, and where a sworn affidavit attests that Plaintiff stated he had quit drinking prior to his alleged attempted entry of Madame X, a cocktail bar. (*See, e.g.*, 5/4/21 Tr. at 257-69; Hamilton Aff. ¶¶ 4, 13.) Defendants have every right to probe this issue.

The same goes for Mizrahi's "questions about Plaintiff's ability/desire to read and write." Where Finkelstein has been indicted for stealing the identity of others to file ADA lawsuits without their knowledge (*see* Finkelstein Indictment ¶¶ 1, 2); where Plaintiff's medical records reflect—and Plaintiff himself acknowledges—that his memory is impaired (*see, e.g.*, 5/4/21 Tr. at 114, 222-67); where Plaintiff himself admitted that his "handwriting is horrible" (3/2/21 Tr. at 3); and where several of Plaintiff's signatures of court documents appear—to the Court's untrained eye, at least—to be written by a steady hand and to be dead ringers for one another (*see, e.g.*, Defs.' Opp. at 2), Defendants are within their rights to probe the degree to which Plaintiff has been a knowing participant in the numerous lawsuits that Finkelstein has filed in his name. Questions as to whether and to what extent Plaintiff reviewed and himself executed the litigation materials submitted in his name are probative of this subject matter.

18

For substantially the same reasons, Defendants have legitimate reason to probe Plaintiff's

relationship with Finkelstein, to the extent that they do not abridge Plaintiff's attorney-client

privilege in doing so. To that end, Mizrahi went to great pains to make the distinction to Plaintiff

that his questions concerned facts about that relationship, but that Plaintiff was not to disclose

any of his communications with Finkelstein. (*See, e.g.*, 8/26/21 Dep. Tr. at 16, 41.) While

Finkelstein purports to interpret the attorney-client privilege expansively, to foreclose virtually

any question concerning Plaintiff's counsel or Plaintiff's relationship with his counsel, the cases

on which Finkelstein relies on regarding this issue make clear that the privilege does not extend

to certain facts about the attorney-client relationship, nor to certain facts underlying a

communication from attorney to client, so long as the client has also learned those facts

independently of attorney-client communication.[17] Accordingly, the Court finds nothing

inappropriate about Mizrahi's questions as to how Plaintiff and Finkelstein met (*see* 8/26/21 Dep.

Tr. at 15-17); as to whether Plaintiff and Finkelstein have entered into a retainer agreement or a

Power of Attorney (*id*. at 41-42); as to the methods and frequency of Plaintiff's communications

with Finkelstein (*id*. at 42-45); and as to whether Plaintiff signed certain documents in front of

Finkelstein (*id*. at 74-79). While it may be, depending on the underlying facts, that some of

---

[17] *See, e.g.*, *In re Colton*, 201 F. Supp. 13, 16 (S.D.N.Y. 1961), *aff'd sub nom. Colton v. United States*, 306 F.2d 633 (2d Cir. 1962) (attorney-client privilege "does not extend to the fact of retention, or to a retainer agreement as evidence of the retention, since such information is required to enable the court to determine that the relation of attorney and client exists"); *Sicurelli v. Jeneric/Pentron, Inc.*, No. 03-CV-04934 (SLT) (KAM), 2005 WL 3591701, at *6 (E.D.N.Y. Dec. 30, 2005), *report and recommendation adopted*, 2006 WL 681212 (E.D.N.Y. Mar. 14, 2006) ("Apart from what plaintiffs may have learned from communications regarding legal advice within the attorney-client relationship, Jeneric was entitled to probe the plaintiffs' knowledge of relevant underlying facts[.]"); *see also, e.g.*, *Vingelli v. U.S., Drug Emf't Agency*, 992 F.2d 449, 452 (2d Cir. 1993) (explaining that retainer agreements generally are not considered privileged because "they are not the kinds of disclosures that would not have been made absent the privilege and their disclosure does not incapacitate the attorney from rendering legal advice").

Finkelstein's privilege objections regarding these questions do have merit, the Court finds nothing abusive, oppressive, or illegitimate about Mizrahi seeking to pursue these lines of questioning in the first instance.

While Plaintiff also objects to Mizrahi's asking about Finkelstein's arrest, the Court finds this subject relevant as well. What Plaintiff claims to have known, and when, about his counsel's alleged criminality, and how, if at all, Plaintiff claims to have reacted, could be probative of the bona fides of Plaintiff's and Finkelstein's ostensible principal-agent relationship. Moreover, the Court's August 7, 2020 Order denying Defendants' Emergency Letter Motion expressly contemplated Plaintiff's deposition as being Mizrahi's opportunity to pose questions to Plaintiff regarding Finkelstein's Criminal Complaint. (*See* 8/7/20 Order.)

Thus, the Court finds none of the lines of questioning about which Plaintiff complains unreasonable, let alone abusive, oppressive or conducted in bad faith.

As for Mizrahi's "attempted obstruction of Plaintiff's pausing of the deposition to take breaks," it was Finkelstein, not Plaintiff, who requested the only break cited by Plaintiff, and he did so less than 40 minutes after a prior 21-minute break. (*See, e.g.*, 4/19/21 Dep. Tr. at 110, 111, 156.) Under these circumstances, the Court finds nothing inappropriate about Mizrahi seeking to limit the break at issue to less than another 20 minutes. And as for Mizrahi's purported "badgering and abusive questioning in the form of mischaracterizing answers and re-asking questions that had been asked upward of seven times," the Court, after close review of the transcripts, finds no evidence of Mizrahi badgering Plaintiff or willfully mischaracterizing answers. As for his allegedly "re-asking" questions, the Court finds that nearly every time Finkelstein complained of a question having been asked multiple times, either Finkelstein was interrupting

Mizrahi by objecting during the setup to a question (*see, e.g.*, 8/26/21 Dep. Tr. at 19); the question was not in fact the same as a prior, similar question (*see, e.g.*, *id*. at 21); or Plaintiff had declined to substantively answer the question when Mizrahi had previously asked it (*see, e.g.*, *id*. at 51). Indeed, as a general matter, the Court reads the transcripts as involving a certain degree of repetition principally as a result of (1) Plaintiff's communication difficulties, as acknowledged by Finkelstein in his suggestion that the deposition be conducted by written questions rather than live questioning; (2) Finkelstein's disruptive interruptions of Mizrahi's questioning; and (3) Plaintiff's frequently uncooperative, nonresponsive answers to Mizrahi's legitimate questions.

Accordingly, the Court declines to impose sanctions against Mizrahi.

## II.   Finkelstein's Deposition Conduct Warrants Sanctions

### A.   Sanctions Against Finkelstein Are Warranted

In contrast, the Court will impose sanctions on Finkelstein. As set forth in Background Sections III and VI, *supra*, Plaintiff's deposition transcripts are riddled with Finkelstein's improper speaking objections, which appear designed to coach Antolini, in violation of Federal Rule of Civil Procedure 30(c)(2) and several Orders of the Court. The transcripts also reflect a host of improper instructions not to answer where Finkelstein had no lawful basis to preclude questioning, also in violation of Rule 30(c)(2) and express Orders of the Court. As discussed above, Finkelstein's ostensible defense—that Mizrahi's questions were abusive, oppressive and in bad faith—does not withstand scrutiny.[18] The April 19 transcript also reflects that Finkelstein improperly

---

[18] In any event, if Finkelstein's had a legitimate basis for his concerns, his remedy was to suspend the deposition and move to terminate or limit, not simply to instruct Plaintiff not to answer. *See* Fed. R. Civ. P. 30(d)(3)(A); *Learning Int'l, Inc. v. Competence Assur. Sys. Inc.*, No. 90-CV-02032 (MBM), 1990 WL 204163, at *3 (S.D.N.Y. Dec. 13, 1990) ("If [counsel] objected to what he regarded as forays into matters

terminated that deposition once Mizrahi began to ask questions concerning his arrest, thereby delaying completion of the deposition by over four months.

The Court thus finds that Finkelstein impeded and frustrated the fair examination of Plaintiff, warranting sanctions pursuant to Rule 30(d)(2). *See, e.g.*, *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 307 (S.D.N.Y. 2019) (finding sanctions appropriate under Rule 30(d)(2) where "Plaintiff's counsel's conduct . . . unnecessarily extended the length of Plaintiff's [] deposition and seriously disrupted Defendants' ability to obtain testimony from Plaintiff"); *Morales v. Zondo, Inc.*, 204 F.R.D. 50, 54 (S.D.N.Y. 2001) (imposing sanctions under Rule 30(d)(2) on counsel whose "interruptions were pervasive, and clearly intended to cause problems for [opposing counsel] in his examination"). The Court further finds that Finkelstein deliberately violated repeated Orders of the Court, warranting sanctions pursuant to Rule 37(b)(2). The Court further finds that Finkelstein's conduct in connection with Plaintiff's deposition, when viewed in its totality, "can only be interpreted as a continuous series of ill-motivated attempts to disrupt and interfere with [Mizrahi's] ability to conduct Plaintiff's deposition and elicit relevant testimony responsive to [his] questions," warranting sanctions pursuant to Section 1927 and the Court's inherent powers. *Scott-Iverson v. Indep. Health Ass'n, Inc.*, No. 13-CV-00451 (LJV) (LGF), 2017 WL 35453, at *9 (W.D.N.Y. Jan. 4, 2017); *see also Unique Concepts, Inc. v. Brown*, 115 F.R.D. 292, 293 (S.D.N.Y. 1987) (imposing sanctions under Section 1927 and the Court's inherent powers where counsel's "attempt in his motion papers to justify his behavior as provoked [wa]s utterly non-compelling").

---

that were not to be the subject of the deposition, he could have sought a ruling from the court. He was not free simply to pepper the proceeding with interruptions and directions not to answer.").

### B.   The Court Declines To Impose A Terminal Sanction

Finkelstein's contumacious deposition misconduct notwithstanding, the Court declines at this stage to impose Defendants' requested sanction of dismissal of Plaintiff's action. (*See* Defs' Mem. at 23-29.) The well-settled preference in this Circuit is for courts to resolve litigation disputes "on their merits, rather than through a discovery sanction." *Scantibodies Lab'y, Inc. v. Church & Dwight Co.*, No. 14-CV-02275 (JGK) (DF), 2016 WL 11271874, at *34-35 (S.D.N.Y. Nov. 4, 2016), *report and recommendation adopted*, 2017 WL 605303 (S.D.N.Y. Feb. 15, 2017) (declining to impose preclusive sanctions where "less drastic sanctions would be sufficient to address the prejudice caused by Plaintiff's discovery abuses"). Here, where Plaintiff's and Finkelstein's misconduct has obstructed and prolonged proceedings in this action but has not caused any irreversible prejudice—*e.g.*, by destroying evidence—the Court finds that dismissal would be incongruous and overly harsh.[19] *See In re Doria/Memon Disc. Stores Wage & Hour Litig.*, No. 14-CV-07990, 2018 WL 1353261, at *2 (S.D.N.Y. Mar. 15, 2018) ("A court must consider the extent to which the prevailing party has been prejudiced by the defaulting party's noncompliance and must ensure that any sanction imposed is just and commensurate with the failure to comply." (internal quotation marks and citation omitted)). Further, the Court "has at least some concern that the preclusive sanction requested by Defendant[s] would unduly penalize Plaintiff for the misconduct of [his] counsel." *Scantibodies Lab'y, Inc.*, 2016 WL 11271874, at *34. Accordingly, the Court will not impose sanctions foreclosing consideration of the merits of Plaintiff's claims.

---

[19] While Defendants argue that Finkelstein "[o]bstructed the[ir] [e]licitation of [m]aterial[] [i]nformation" by altogether preventing them from obtaining testimony from Plaintiff in response to certain lines of inquiry (*see* Defs.' Reply at 10), Defendants have not sought to compel further testimony from Plaintiff.

**C.** **The Court Will Impose Monetary Sanctions Against Finkelstein**

After carefully considering the record before it, the Court, in its discretion, imposes monetary sanctions against Finkelstein in the amount of $6,250.00, plus the reasonable fees and costs incurred by Defendants in seeking sanctions and opposing Plaintiff's motion for sanctions.

Having repeatedly and explicitly warned Finkelstein that the Court would impose monetary sanctions on him for "each and every" speaking objection he made, the Court will carry through on this promise. Accordingly, from the conclusion of the Court's second call with the parties during the April 19 deposition, through to the end of the August 26 continued deposition, the Court will levy on Finkelstein a sanction of $50.00 for each speaking objection, and $100.00 for each unwarranted instruction not to answer.[20] *Cf. Scott-Iverson*, 2017 WL 35453, at *9 (imposing "a reasonable fine [ranging from $50.00 to $500.00] for each occurrence" of "unwarranted interruptions and objections"). By the Court's count, there were 39 instances of the former, and 43 instances of the latter, for an aggregate of $6,250.00.

In addition, Finkelstein shall pay Defendants their reasonable attorneys' fees and costs incurred in preparing the briefing necessitated by Finkelstein's deposition misconduct. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd.*, 328 F.R.D. at 123-24 ("Under Rule 37(b), the Court 'must' order [the plaintiff] to pay the reasonable expenses, including attorneys' fees, caused by its failure to comply with the Court's Orders, unless the failure was substantially justified or other circumstances make an award of expenses unjust."). That briefing includes the following: (1) Defendants' June 18, 2021 brief requesting sanctions against Finkelstein (ECF No. 182); (2)

---

[20] The Court will not count instances where Finkelstein instructed Plaintiff not to answer on the basis of the attorney-client privilege or of a Court Order—notwithstanding the Court's belief that the majority of these invocations lacked merit.

Defendants' September 14, 2021 brief in further support of that request and in response to the Court's Order to Show Cause (ECF No. 235); (3) Defendants' October 15, 2021 opposition to Plaintiff's motion for sanctions (ECF No. 248); and (4) Defendants' October 18, 2021 reply brief in further support of their request for sanctions (ECF No. 249) (collectively, "Defendants' Sanctions Briefing"). *See Scantibodies Lab'y, Inc.*, 2016 WL 11271874, at *37 ("It is generally appropriate, at a minimum, to require a party that has not complied with its discovery obligations to pay the reasonable fees and costs incurred by the moving party . . . in seeking discovery sanctions."); *SS&J Morris, Inc. v. I. Appel Corp.*, No. 97-CV-06938 (LMM) (DFE), 2000 WL 1028680, at *7 (S.D.N.Y. July 26, 2000) (awarding party "all of the reasonable expenses and attorneys' fees for bringing [its own] sanctions motion and for opposing [its adversary's] cross-motion").

### III.    Sanctions Against Plaintiff And Finkelstein For Cancellation Of The July 23 Deposition

After having received proper notice, Plaintiff failed to appear for his continued deposition on July 23. Thus, Defendants are further entitled to sanctions pursuant to Fed. R. Civ. P. 37(d)(1)(A)(i). Under Rule 37, the Court "must" require Plaintiff or his attorney or both "to pay the reasonable expenses, including attorney's fees, caused by [Plaintiff's] failure [to attend the continued deposition], unless the failure was substantially justified or other circumstances make an award of expenses unjust." *See* Fed. R. Civ. P. 37(d)(3).

Here, the conduct of Plaintiff and Finkelstein was not substantially justified, nor is an award of attorneys' fees unjust. The two excuses proffered by Plaintiff for not going forward with the July 23 deposition—*i.e.*, his desire to accompany his wife to the hospital in connection with her broken arm and his grandson not being available to assist with the video for his deposition— do not provide substantial justification. On July 7, 2021, when Finkelstein filed a letter with the

Court stating that he and Plaintiff were available for Plaintiff's continued deposition on July 23, Plaintiff's wife already had broken her arm and his grandson already had left for Italy, or was about to do so. Plaintiff's deposition was scheduled for three hours commencing at 10 a.m. on July 23. Even assuming that Plaintiff's wife needed accompaniment to her hospital appointment, Plaintiff has not made a showing why the appointment could not have been scheduled for the afternoon of July 23 or why someone else could not have accompanied her. Moreover, Plaintiff and Finkelstein had ample time after Plaintiff's grandson's departure to arrange for Plaintiff to obtain assistance with the video for his deposition; no substantial justification exists for their failure to do so. Thus, the Court finds that an award of the reasonable attorneys' fees incurred by Defendants in connection with the cancelled court-ordered deposition on July 23 is appropriate.

Rule 37(d)(3) permits the imposition of sanctions against "the party failing to act, the attorney advising that party, or both." Fed. R. Civ. P. 37(d)(3). Because both Plaintiff and Finkelstein bear some fault for the video deposition not proceeding on July 23 (*i.e.*, Plaintiff decided on his own not to make himself available on July 23, and Finkelstein and Plaintiff failed to take steps to ensure that the deposition could proceed by video), the Court imposes the sanctions upon Plaintiff and Finkelstein jointly and severally. The Court next turns to the amount of fees to award.

"A district court exercises 'considerable discretion' in awarding attorneys' fees." *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-05345 (AJN) (KHP), 2020 WL 614656, at *1 (S.D.N.Y. Feb. 7, 2020) (citations omitted). "Attorneys' fees are awarded by determining a presumptively reasonable fee, or a 'lodestar,' reached by multiplying a reasonable hourly rate by the number of

hours reasonably expended." *Id*. (citations omitted). In their July 27, 2021 submission to the Court, Defendants requested an award of attorneys' fees in the amount of $1,881.25 for their counsel's preparation for the cancelled July 23 deposition. (*See* Defs.' July 27 Ltr. at 3.) Defendants arrived at this figure by claiming 5.25 hours billed by Mizrahi, at an hourly rate of $225.00, and 1.75 hours billed by a more senior attorney, Joshua Levin-Epstein ("Levin-Epstein"), at an hourly rate of $400.00. (*See* Time Records, ECF No. 207-1.)

The Court finds that the $225.00 hourly rate for Mizrahi is reasonable. (*See* 9/14/20 Order, ECF No. 79.) In addition, based upon its review of the time records submitted by Defendants, the Court, in its discretion, finds that 2.5 of the hours claimed were reasonably expended by Mizrahi in connection with preparations for the continued deposition. The Court further finds it appropriate for Defendants' counsel to be reimbursed for an additional hour at Mizrahi's rate for his appearances at the telephone conferences the Court held as a result of Plaintiff's cancellation of the July 23 continued deposition, first on the afternoon of July 23, and then, after Plaintiff failed to appear at that conference, on August 4. Thus, reimbursing Defendants for a total of 3.5 hours at a $225.00 hourly rate, in the Court's view, achieves "rough justice." *See Fox v. Vice*, 563 U.S. 826, 838, (2011) ("The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection.").

The Court declines to award legal fees based upon the 1.75 hours billed by Levin-Epstein. Given that Plaintiff's continued deposition was not to exceed three hours, which was the approximate amount of time Mizrahi had left in his questioning when Finkelstein terminated the original deposition, the Court finds it is not reasonable to pass along to Plaintiff the cost of Levin-Epstein's time. *See Errant Gene Therapeutic, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, 286 F.

Supp. 3d 585, 589 (S.D.N.Y. 2018) (reducing fee award for hours spent by additional litigation team member), *aff'd*, No. 15-CV-02044 (AJN) (SDA), 2018 WL 3094913 (S.D.N.Y. June 21, 2018), *aff'd*, 768 F. App'x 141 (2d Cir. 2019).

Accordingly, the Court hereby awards $787.50 to Defendants for the cancelled July 23 deposition (*i.e.*, 3.5 hours spent by Mizrahi times $225.00 per hour).

## CONCLUSION

By reason of the foregoing, Plaintiff's motion for sanctions is DENIED, and Defendants' request for sanctions is GRANTED IN PART and DENIED IN PART.

The Court imposes monetary sanctions against Finkelstein in the amount of $6,250.00 for his conduct during Plaintiff's deposition. No later than thirty days from the date of this Opinion and Order, Finkelstein shall pay such amount to the Clerk of Court.

The Court further imposes monetary sanctions against Finkelstein in the amount of Defendants' reasonable attorneys' fees and costs incurred in connection with the parties' cross-requests for sanctions. No later than fourteen days from the date of this Opinion and Order, Defendants' counsel shall file with the Court a declaration setting forth the fees and costs incurred for preparation of Defendants' Sanctions Briefing. No later than two weeks thereafter, Plaintiff may file any objection in a letter not to exceed three pages.

In addition, the Court imposes monetary sanctions against Plaintiff and Finkelstein, jointly and severally, in the amount of $787.50 for cancellation of the court-ordered July 23 deposition. No later than thirty days from the date of this Opinion and Order, Finkelstein and/or Plaintiff shall pay such amount to Defendants.

The Clerk of Court is respectfully directed to close the gavel at ECF No. 245.

**SO ORDERED**.

Dated:        November 19, 2021
              New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**